Case No. 23-20494

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**ELIZABETH ESCOBEDO,**                                    **PLAINTIFF-
                                                            APPELLEE**

**vs.**

**ACE GATHERING, INCORPORATED,**                   **DEFENDANT-
                                                    APPELLANT**

---

*On Appeal from United States District Court
for the Southern District of Texas, Case Number 4:22-cv-538*

---

## RESPONSE BRIEF
## OF
## PLAINTIFF-APPELLEE ELIZABETH ESCOBEDO

---

Colby Qualls, Esq.
Katherine Serrano, Esq.
**FORESTER HAYNIE, PLLC**
400 North Saint Paul Street, Suite 700
Dallas, TEXAS 75201
Telephone: (214) 210-2100
cqualls@foresterhaynie.com
kserrano@foresterhaynie.com

Counsel for Plaintiff – Appellee Elizabeth Escobedo

Case No. 23-20494

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**ELIZABETH ESCOBEDO,**                                   **PLAINTIFF-**
                                                          **APPELLEE**

**vs.**

**ACE GATHERING, INCORPORATED,**                          **DEFENDANT-**
                                                          **APPELLANT**

---

*On Appeal from United States District Court*
*for the Southern District of Texas, Case Number 4:22-cv-538*

---

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    Ms. Elizabeth Escobedo (Plaintiff-Appellee)

2.    Mr. Jamey Alaniz (Opt-in Plaintiff)

3.    Mr. Matias Martinez (Opt-in Plaintiff)

4.    Mr. Gene Lewis (Opt-in Plaintiff)

5.    Ace Gathering, Inc. (Defendant-Appellant)

6.    Arch Insurance Group, Inc. (Insurer for Defendant-Appellant)

7.    Mr. Colby Qualls and Ms. Katherine Serrano—Forester Haynie, PLLC (Counsel for Plaintiff-Appellee and Opt-in Plaintiffs)

8.    Mr. Josh Sanford—Sanford Law Firm, PLLC (former Counsel for Plaintiff-Appellee and Opt-in Plaintiffs)

9.    Mr. Jim Adler—Jim Adler & Associates (referral Counsel for Plaintiff-Appellee)

10.    Mr. Mark D. Temple, Mr. Peter J. Stuhldreher, and Mr. Paul M. Knettel—Baker & Hostetler, LLP (Counsel for Defendant-Appellant)

*/s/ Colby Qualls*
Colby Qualls

Attorney of Record for Ms. Elizabeth
Escobedo, Plaintiff—Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to <u>Federal Rule of Appellate Procedure 34(a)(1)</u> and Fifth Circuit Rule 28.2.3, Plaintiff—Appellee respectfully submits that oral argument is not necessary. The facts and legal arguments are adequately presented in the briefs and record, the governing law is well-established, and the Court's decisional process will not be significantly aided by oral argument in this appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS....................................................................................iv

TABLE OF AUTHORITIES .............................................................................vi

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF CASE ....................................................................................3

SUMMARY OF THE ARGUMENT .....................................................................4

ARGUMENT ...................................................................................................7

     **A. Standard of Review**................................................................................7

     **B. Legal Standard: the MCA Exemption** ...................................................8

     **C. Plaintiffs did not move Ace's crude oil in interstate commerce**...........9

          <u>1. Whether goods are in interstate commerce is determined by the goods' "essential   character," which is determined by the shippers "fixed and persisting intent."</u> ...............................................10

               *i. Ace is the "shipper" because it is the entity with control over and interest in the goods in the relevant leg of its journey*............................................................................13

               *ii. Ace did not have a "fixed and persisting intent" that the goods cross state lines*.........................................................20

          <u>2. The District Court did not err in determining that Ace is the shipper and evaluating its intent with respect to crude oil</u>.................26

     **D. The District Court properly found that fact questions remained as to whether Plaintiffs had an expectation of interstate travel**......................31

1. Whether an employee has an expectation of interstate travel depends on a review of the totality of the circumstances ..................32

2. The District Court properly considered all the evidence in its conclusion that Ace had not met its burden on summary judgment ............................................................................................33

    *i. The District Court's review of the evidence properly concluded that, taken with consideration of all the circumstances, the* Olibas *factors did not weigh in favor of Ace*...........................................................................34

    *ii. The District Court did not err in concluding Ace's "other undisputed evidence" was insufficient to meet its burden on summary judgment*..................................................38

    *iii. The totality of the evidence clearly demonstrates that Ace did not meet its burden on summary judgment "as a matter of law"* ...........................................................42

CONCLUSION .......................................................................45

CERTIFICATE OF COMPLIANCE.......................................46

CERTIFICATE OF SERVICE .................................................47

# TABLE OF AUTHORITIES

## Cases

*Alice v. GCS, Inc.,* No. 05 C 50132, 2006 U.S. Dist. LEXIS 65498 (N.D. Ill. Sep. 14, 2006)..................................................................................... 22, 25

*Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279 (5th Cir. 2014).................... 5, 38

*Amaya v. Noypi Movers, L.L.C.*, 741 F. App'x 203 (5th Cir. 2018) ................. 9, 35

*Atlantic Coast Line Ry. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257 (1927); .........................................................................................................12

*Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166 (1922) .....................................12

*Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217 (2d Cir. 2002). 14, 17, 21, 22, 24

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) ...............................................39

*Brown v. AGM Entm't, Inc.*, No. H-07-3439, 2008 U.S. Dist. LEXIS 51167 (S.D. Tex. July 3, 2008)................................................................................ 4, 10, 11

*Butcher v. TSWS, Inc.*, Civil Action No. 4:10-CV-01376, 2011 U.S. Dist. LEXIS 95440 (S.D. Tex. Aug. 25, 2011),.........................................................................37

*Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575 (5th Cir. 2018)...................9

*Coleman v. Jiffy-June Farms, Inc.*, 324 F. Supp. 664 (S.D.Ala.1970), aff'd, 458 F.2d 1139 (5th Cir.), cert. denied, 409 U.S. 948 (1972),................................ 35, 36

*Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895 (7th Cir. 2009) . 13, 15, 25, 30

*Craft v. Ray's, LLC,* No. 1:08-cv-627-RLY-JMS, 2009 U.S. Dist. LEXIS 90862 (S.D. Ind. Sep. 29, 2009)................................................................................. 23, 24

*Cunningham v. Mission Support All., LLC*, No. 4:18-CV-5060-RMP, 2019 U.S. Dist. LEXIS 243470 (E.D. Wash. July 22, 2019)............................................. 5, 40

*Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227 (M.D. Fla. 2010) .................... 39, 40

*Easom v. US Well Servs.*, 37 F.4th 238 (5th Cir. 2022)................................. 7, 8, 31

vi

*Estrada v. Ecology Servs. Refuse & Recycling, LLC*, Civil Action No. GLR-17-496, 2018 U.S. Dist. LEXIS 205184 (D. Md. June 12, 2018)..... 11, 21, 22, 24, 25

*Foreman v. Five Star Food Serv.*, 950 F. Supp. 2d 958 (M.D. Tenn. 2013)... 13, 14, 15

*Foreman v. Five Star Food Serv.*, No. 3:11-cv-01124, 2013 U.S. Dist. LEXIS 150182 (M.D. Tenn. Oct. 18, 2013) ....................................................13

*Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969)....................................23

*Glanville v. Dupar, Inc.*, No. H-08-2537, 2009 U.S. Dist. LEXIS 88408 (S.D. Tex. Sep. 25, 2009) ....................................................... 15, 22, 23

*Guy v. Absopure Water Co.*, No. 20-12734, 2023 U.S. Dist. LEXIS 20879 (E.D. Mich. Feb. 8, 2023) ....................................................13

*Harrison v. Delguerico's Wrecking & Salvage*, No. 13-5353, 2016 U.S. Dist. LEXIS 75955 (E.D. Pa. June 10, 2016)..............................................39

*Harrison v. Lazer Spot*, Inc., No. 1:20-CV-01200, 2021 U.S. Dist. LEXIS 238907 (M.D. Pa. Dec. 14, 2021) ....................................................41

*Haynes v. S. Carolina Waste LLC*, 633 F. Supp. 3d 769 (D.S.C. 2022) ................11

*Kimball v. Goodyear Tire & Rubber Co.*, 504 F. Supp. 544 (E.D. Tex. 1980),35, 36

*Malbrough v. Crown Equip. Corp.*, 392 F.3d 135 (5th Cir. 2004)...........................8

*Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786 (3d Cir. 2016) ............... 25, 29

*Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042 (5th Cir. 1976).... 10, 29

*Noll v. Flowers Foods Inc.*, 442 F. Supp. 3d 345 (D. Me. 2020) ...........................14

*Olibas v. Barclay*, 838 F.3d 442 (5th Cir. 2016). ................................. 32, 33, 34, 42

*Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246 (3d Cir. 2005) ................... 25, 29

*Pineda v. Frisolino, Inc.*, 2017 U.S. Dist. LEXIS 139735 (S.D.N.Y. Aug. 29, 2017) ......................................................................... 6, 40

*Project Hope v. M/V IBN SINA*, 250 F.3d 67 (2d Cir. 2001) ...............................12

*Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947) ................................38

*Raymond v. Mid-Bronx Haulage Corp.*, 2017 U.S. Dist. LEXIS 50430 (S.D.N.Y. Mar. 31, 2017)................................................................ 11, 12, 14, 16, 17, 18, 25

*Romero v. Fueltech Oil Service Corp.*, Case No. 09-21948-CIV-GRAHAM/TORRES, 2010 WL 11505519 (S.D. Fla. Apr. 5, 2010)............ 14, 19

*Rose v. Chem. Lime, Ltd.*, No. A-11-CV-854-LY, 2012 U.S. Dist. LEXIS 201093 (W.D. Tex. Feb. 29, 2012); ..........................................................................32

*Ryan v. Amazon Petroleum Corp.*, 71 F.2d 1 (5th Cir. 1934) ................................13

*Siller v. L&F Distribs.*, No. 96-40549, 1997 U.S. App. LEXIS 42893 (5th Cir. Feb. 18, 1997)............................................................................. 4, 10, 20, 21

*Songer v. Dillon Res., Inc.*, 618 F.3d 467 (5th Cir. 2010) .......................................32

*Songer v. Dillon Res., Inc.*, 636 F. Supp. 2d 516 (N.D. Tex. 2009)............ 38, 39, 41

*Soto v. William's Truck Serv.*, No. 3:11-CV-3242-B, 2013 U.S. Dist. LEXIS 17223 (N.D. Tex. Feb. 8, 2013). .........................................................................8, 9

*Tanks v. Lockheed Martin Corp.*, 417 F.3d 456 (5th Cir. 2005) ..............................8

*Texas v. Anderson, Clayton & Co.*, 92 F.2d 104 (5th Cir. 1937) .................... 11, 19

*Texas v. United States*, 866 F.2d 1546 (5th Cir. 1989)................................. 11, 18, 30

*Van Overdam v. Tex. A&M Univ.*, 43 F.4th 522 (5th Cir. 2022) ...........................31

*Veney v. John W. Clarke, Inc.*, 28 F. Supp. 3d 435 (D. Md. 2014) 12, 14, 17, 18, 22, 25

*Walters v. Am. Coach Lines of Miami*, No. 07-22000-CIV-UNGARO/SIMONTON, 2009 U.S. Dist. LEXIS 137229 (S.D. Fla. June 1, 2009)...............................................................................................................41

*Watts v. Oil Patch Water & Sewer Services, LLC*, 4:13-cv-01176, Opinion on Partial Judgment, p. 2, Doc. No. 36 (S.D. Tex., Filed Feb. 4, 2015)....................36

**Statutes, Rules, and Regulations**

28 U.S.C. § 1292(b) ............................................................................... 1, 7, 31

28 U.S.C. § 1331 ................................................................................... 1

29 C.F.R. § 782.2 ...................................................................... 5, 32, 38

29 U.S.C. § 207 ................................................................................... 8

29 U.S.C. § 213(b)(1) ......................................................................... 8

29 U.S.C. § 206 ................................................................................... 8

49 U.S.C. § 13501(1) .......................................................................... 8

49 U.S.C. § 31502(b) .......................................................................... 8

Fed. R. Civ. P. 56 ......................................................................... 8, 31

I.C.C. Policy Statement, 1992 MCC LEXIS 50 (Fed. Motor Carrier Safety Admin. April 27, 1992) ......................................................... 4, 11

Rule 5(b) of the Federal Rules of Appellate Procedure ........................... 1

Rule 32 of the Federal Rules of Appellate Procedure ........................... 46

## JURISDICTIONAL STATEMENT

The Southern District of Texas ("the District Court") has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the underlying claims arise under the Fair Labor Standards Act ("FLSA"). (ROA.8–18). The District Court certified for interlocutory appeal its Opinion and Order denying Defendant-Appellant Ace Gathering, Inc.'s ("Ace") request for summary judgment as to the application of the Motor Carrier Act ("MCA") Exemption to the FLSA to Plaintiff-Appellee Elizabeth Escobedo's and Opt-in Plaintiffs Jamey Alaniz, Matias Martinez, and Gene Lewis's (collectively "Plaintiffs") employment with Ace. (ROA.796–98). Accordingly, after permitting interlocutory appeal, the Fifth Circuit has jurisdiction over the current appeal pursuant to 28 U.S.C. § 1292(b) and Rule 5(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred in denying summary judgment as to the application of the MCA Exemption when it concluded that Ace, as the shipper of crude oil, did not have the fixed and persisting intent that its shipments of crude oil would cross state lines at the time of shipment. (ROA.643–50).

2.     Whether the District Court erred in denying summary judgment as to the application of the MCA Exemption when it concluded that Ace failed to establish that Plaintiffs had a reasonable expectation that they could be required to cross state lines in the furtherance of their duties for Ace. (ROA.643–50).

## STATEMENT OF THE CASE

As stated in its Appellant's Brief, Ace is a "crude oil gathering service[]," which purchases crude oil from oil fields and resells it to other companies that refine or otherwise process the crude oil, sometimes in the State of Texas and sometimes outside of Texas. Appellant's Brief, pp. 3–4. (ROA.184–86, 335–36, 374). Due to the nature of crude oil, Ace delivers its customers' orders via pipeline injection. (ROA.185–186, 335–36, 374, 404–05, 437–38, 468–69, 504–05). To complete this transaction, Ace employs drivers, such as Plaintiffs, to pick up the crude oil from the oil fields and drive it to the pipeline injection point. (ROA.185, 336, 374, 404–05, 437–38, 468–69, 504–05). At that point, ownership and control over the crude oil passes from Ace to Ace's customers. (ROA.185–86, 335–36, 374). Ace's customers collect the crude oil somehow and someway along the pipeline, but it is *undisputed* that Ace owns and controls the crude oil as it travels from oil field to pipeline injection point, but no longer has control over or interest in the crude oil after the oil is injected into the pipeline. (ROA.184–92, 335–36, 374–79, 401–405, 434–38, 464–69, 502–05). *See also*, Mem. and Order ("MSJ Order"), ROA.647–49.

Critically, almost all of the movement of crude oil from the oil fields to the pipeline injection points is within the State of Texas, and Plaintiffs themselves never once crossed state lines in the performance of their duties for Ace. *See* MSJ

Order, ROA.647–49. Indeed, while some of Ace's Texas terminals, particularly those located close to the state line, made semi-regular trips across state lines, Ace's own records show that less than 1% of all deliveries from Ace's Southern Terminal, from which Plaintiffs were stationed, were made to out-of-state injection points. (ROA.356–370, 524–528, 540–552).

## SUMMARY OF THE ARGUMENT

The District Court correctly applied well-established legal precedent in denying Ace's request for summary judgment as to the application of the MCA Exemption.

1.      Whether Plaintiffs participated in interstate commerce depends on the "essential character" of the goods transported by Plaintiffs, a fact which turns on the shipper's "fixed and persisting intent" at the time of shipment regarding the "ultimate destination" of the shipment. *Brown v. AGM Entm't, Inc.*, No. H-07-3439, 2008 U.S. Dist. LEXIS 51167, at *5 (S.D. Tex. July 3, 2008); *Siller v. L&F Distribs.*, No. 96-40549, 1997 U.S. App. LEXIS 42893, at *5 (5th Cir. Feb. 18, 1997); I.C.C. Policy Statement, 1992 MCC LEXIS 50 (Fed. Motor Carrier Safety Admin. April 27, 1992). Because Ace purchases crude oil, then resells and distributes it to refinery companies, the District Court correctly determined that Ace was the "shipper" of the crude oil. *See* MSJ Order, ROA.647–49. Accordingly, because Ace's ownership of, interest in, and control over the crude

oil ends at the injection point within the State of Texas, Ace's role in the movement of crude oil is that of a local distributor and Ace did not have the requisite "fixed and persisting intent" that the crude oil cross state lines that would move the oil into the stream of commerce. (ROA.647–49).

2.     Ace failed to meet its burden on summary judgment that Plaintiffs had a reasonable expectation that they could be required to cross state lines. It is well-settled law that a court must evaluate the *reality* of employees' working conditions when determining their exempt status; pre-employment characterization (such as offer letters) and the employees' own understanding of and agreement to that characterization are insufficient. *See Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 283–88 (5th Cir. 2014) (noting that in proving the interstate commerce requirements, "neither the name given to his position nor that given to the work that he does is controlling," but rather "what is controlling is the character of the activities involved in the performance of [the employee's] job" (internal editing marks in original)) (citing 29 C.F.R. § 782.2(a), (b)(2)); *Cunningham v. Mission Support All., LLC*, No. 4:18-CV-5060-RMP, 2019 U.S. Dist. LEXIS 243470, at *25 (E.D. Wash. July 22, 2019) (rejecting the employer's argument that the employees agreed they were exempt employees in a collective bargaining agreement because "FLSA rights cannot be abridged by contract or otherwise waived" and "congressionally granted FLSA rights take precedence over

conflicting provisions in a collectively bargained compensation arrangement"); *Pineda v. Frisolino, Inc*., 2017 U.S. Dist. LEXIS 139735, at *30 (S.D.N.Y. Aug. 29, 2017) (noting that a "mistaken belief or misunderstanding of the law is not a valid defense to an FLSA overtime claim" because FLSA rights cannot be waived). Likewise, Ace's evidence regarding the percentage of trips driven out-of-state and its assertion that out-of-state trips were assigned indiscriminately fall apart under closer scrutiny. (ROA.356–370, 523–530, 540–552). As more thoroughly described below, the District Court correctly and properly examined Ace's proffered evidence and concluded that a question of fact remained as to whether Plaintiffs had a reasonable expectation that they may be required to travel in interstate commerce. MSJ Order, ROA.649.

6

## ARGUMENT

In denying Ace's request for summary judgment, the District Court correctly applied well-settled law to Ace's crude oil transportation operations. Ace's arguments otherwise amount to a dispute over the District Court's analysis of the facts rather than its application of law. Ace disputes the District Court's finding of fact that Ace's ownership of, interest in, and control over the crude oil shipments rendered Ace the "shipper" of the goods for the relevant leg of the crude oil's journey and would prefer that the District Court imbue Ace with Ace's customers' interstate intent, but disputing a finding of fact is not a basis for reversal, particularly on interlocutory appeal. Likewise, Ace disputes the District Court's finding that the totality of the circumstances surrounding Plaintiffs' expectation of interstate travel left questions of fact for trial. Again, Ace would prefer the District Court rule in its favor but cannot show that the District Court's analysis was an error warranting reversal. The District Court's Order denying summary judgment should be upheld by this Court.

## A.    Standard of Review

This Court "ordinarily review[s] a district court's summary judgment ruling de novo," but appellate jurisdiction under § 1292(b) "extends only to controlling questions of law," and accordingly, the Court only reviews the questions of law certified for appeal. *Easom v. US Well Servs.*, 37 F.4th 238, 241 (5th Cir. 2022)

(quoting *Tanks v. Lockheed Martin Corp.*, 417 F.3d 456, 461 (5th Cir. 2005)). The Court does not review whether the parties have properly shown "'that there is [a] genuine dispute as to any material fact' under Rule 56." *Id*. (quoting Fed. R. Civ. P. 56(a)). Instead, the Court's review is "limited to the narrow question of statutory interpretation" raised by Ace. *Malbrough v. Crown Equip. Corp.*, 392 F.3d 135, 136 (5th Cir. 2004).

## B. Legal Standard: the MCA Exemption

The FLSA creates financial obligations upon employers such as Ace, including the requirement that for every hour worked in excess of 40 per week, the employer must pay a premium rate of 1.5 times the employee's normal hourly rate ("overtime pay"). 29 U.S.C. §§ 206, 207. However, the FLSA exempts certain employees from its overtime protections, including "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." 29 U.S.C. § 213(b)(1). Congress provided for the Secretary of Transportation to "prescribe requirements for qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier," 49 U.S.C. § 31502(b), if it provides interstate transportation of property or passengers. *Id*. at § 13501(1). This exemption to the FLSA's minimum wage and overtime requirements based on the authority of the Secretary of Transportation is

commonly referred to as the MCA exemption. Ace bears the burden of establishing the applicability of the MCA exemption. *Soto v. William's Truck Serv.*, No. 3:11-CV-3242-B, 2013 U.S. Dist. LEXIS 17223, at *6 (N.D. Tex. Feb. 8, 2013).

This Court has noted that although FLSA exemptions, including the MCA Exemption, are to be given a "fair reading," rather than the "narrow construction" formerly used, the Fifth Circuit's prior opinions regarding application of the MCA exemption "remain unaffected because they concern the interpretation and application of FLSA-implementing regulations, not the statute itself." *Amaya v. Noypi Movers, L.L.C.*, 741 F. App'x 203, 205 n.2 (5th Cir. 2018) (quoting *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018)). Accordingly, Ace's call for a "broadly construed" reading of the MCA Exemption runs contrary to controlling law and must be disregarded.

## C.    Plaintiffs did not move Ace's crude oil in interstate commerce.

In making its arguments that the crude oil shipments at issue were within the stream of interstate commerce, Ace presents such a granular and circular view of relevant law that the principles and standards lose all meaning. The applicable law in this case is simple and easily applied, and the District Court did so with ease and clarity. Based on the undisputed facts in this case, the District Court concluded that Ace, as the shipper of crude oil, did not have a fixed and persisting intent that the oil cross state lines or enter interstate commerce. *See* MSJ Order, ROA.647–49.

Ace's novel idea that it is Ace's customers' intent that is relevant to the inquiry is unsupported by either the statute or case law.

1.   Whether goods are in interstate commerce is determined by the goods' "essential character," which is determined by the shipper's "fixed and persisting intent."

The MCA defines interstate commerce as commerce being "between a place in a state and a place in another state," but this phrase has been interpreted to include the "actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce." *Siller v. L&F Distribs.*, No. 96-40549, 1997 U.S. App. LEXIS 42893, at *3 (5th Cir. Feb. 18, 1997) (citing *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir. 1976)). For example, a "carrier is engaged in interstate commerce when transporting goods either originating in transit from beyond Texas or ultimately bound for destinations beyond Texas, even though the route of a particular carrier is wholly within one state." *Id.*

"[W]hether the transportation between two points in a single state is interstate or intrastate depends on the shipment's 'essential character.'" *Brown v. AGM Entm't, Inc.*, No. H-07-3439, 2008 U.S. Dist. LEXIS 51167, at *5 (S.D. Tex. July 3, 2008) (quoting *Siller*, 1997 U.S. App. LEXIS 42893, at *5). It is well-established in this and other Circuits that the shipper's "fixed and persisting intent" at the time of shipment is crucial to determining the shipment's essential character,

10

and therefore essential to determine whether the goods moved in interstate commerce. *Brown*, 2008 U.S. Dist. LEXIS 51167, at *5; I.C.C. Policy Statement, 1992 MCC LEXIS 50 (Fed. Motor Carrier Safety Admin. April 27, 1992) ("The essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination."). *See also Texas v. United States*, 866 F.2d 1546, 1559-60 (5th Cir. 1989) ("It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment.") (quoting *Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir. 1937)); *Haynes v. S. Carolina Waste LLC*, 633 F. Supp. 3d 769, 781-82 (D.S.C. 2022) ("Whether intrastate transportation constitutes interstate commerce relies on the shipper's fixed and persistent intent the product continues in interstate transit."); *Estrada v. Ecology Servs. Refuse & Recycling, LLC*, Civil Action No. GLR-17-496, 2018 U.S. Dist. LEXIS 205184, at *6 (D. Md. June 12, 2018) ("To determine whether transportation is interstate or intrastate, the Court considers the 'original and persisting intention' of the shippers at the time of shipment."); *Raymond v. Mid-Bronx Haulage Corp.*, 2017 U.S. Dist. LEXIS 50430, at *13–14 (S.D.N.Y. Mar. 31, 2017) ("Whether intrastate transportation is involved 'in the flow of interstate

11

commerce' is in turn determined by reference to 'the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement.'") (quoting *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001)); *Veney v. John W. Clarke, Inc.*, 28 F. Supp. 3d 435, 443–44 (D. Md. 2014) ("'The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce' . . . '[T]he essential nature of the traffic as a through movement to the point of ultimate destination [may be] shown by the original and persisting intention of the shippers which was carried out.'") (quoting *Atlantic Coast Line Ry. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268 (1927); *Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 173–74 (1922)).

Thus, to determine whether goods are moving in interstate commerce, courts must a) determine the identity of the shipper, then b) examine that shipper's intent with respect to the goods' movement.[1]

---

[1]     In an effort to divide and obfuscate relevant and easily applied law, Ace argues that the shipper's intent should only be considered when the good has come to rest in a warehouse or other storage facility from another state, which, according to Ace, does not apply here because the crude oil is injected into a pipeline of continuous movement from within the state. Appellant's Brief, p. 29. First of all, this is an extremely self-serving and narrow application of the law; as stated above, relevant case law shows that the shipper's intent is

> i.   *Ace is the "shipper" because it is the entity with control over and interest in the goods during the relevant leg of its journey.*

To determine the identity of the shipper, courts "find[] it most appropriate to identify as the shipper the entity that functionally plays the most significant role in directing and controlling the transportation of goods." *Guy v. Absopure Water Co.*, No. 20-12734, 2023 U.S. Dist. LEXIS 20879, at *11–12 (E.D. Mich. Feb. 8, 2023) (citing *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 898 (7th Cir. 2009)). "The factfinder should consider all appropriate factors, *including which entity arranged for and paid for that transportation*." *Id*. (emphasis added). *See also Foreman v. Five Star Food Serv.*, 950 F. Supp. 2d 958, 969-70 (M.D. Tenn. 2013), vacated in part by *Foreman v. Five Star Food Serv.*, No. 3:11-cv-01124, 2013 U.S. Dist. LEXIS 150182, at *9 (M.D. Tenn. Oct. 18, 2013) (noting that "circumstances matter, including whether the original shipping entity or entities controlled, either

---

relevant regardless of whether the goods are stored. Moreover, Ace is making a distinction without a difference. Crude oil is a good like any other and must be treated as a good like any other. *See generally*, *Ryan v. Amazon Petroleum Corp.*, 71 F.2d 1 (5th Cir. 1934). That it must be "stored" via pipeline rather than in a traditional warehouse does not alter the undisputed facts of this case: Ace purchased crude oil from oil fields, then deposited it in a storage facility from which its customers retrieved it. Here, if any "warehousing" of the good occurred, it was in a pipeline.

directly or through affiliates, the ultimate intrastate destination of the products during and after the products crossed state lines"). Implicit in this analysis is the idea that a single shipment of goods may have more than one "shipper" at various legs of its journey,[2] and the proper analysis here is whether Ace or Ace's customers were the "shippers" when Ace's employees were transporting crude oil on this first leg of the crude oil's journey.

Ace would have the Court determine that the "shippers" in this case are its customers who collect the crude oil from the pipeline and subsequently, occasionally move it across state lines. Ace bases this argument on the fact that the

---

[2]    *See, e.g., Romero v. Fueltech Oil Service Corp.*, Case No. 09-21948-CIV-GRAHAM/TORRES, 2010 WL 11505519, at *4 (S.D. Fla. Apr. 5, 2010) (noting that the original "shippers" were the entities that initially shipped the goods and controlled it along its path until it changed hands within the state where it came to rest); *Veney*, 28 F. Supp. 3d at 443 (determining that a waste collection service that deposited waste at an in-state facility was the shipper of the waste until it was collected by the purchaser); *Raymond*, 2017 U.S. Dist. LEXIS 50430, at *22–24 (same). *See also Noll v. Flowers Foods Inc.*, 442 F. Supp. 3d 345, 359-61 (D. Me. 2020) (determining that goods were in a continuous flow of interstate commerce because the original importer of the goods and the local distributor were the same entity and therefore the same shipper maintained control as the goods crossed state lines); *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 224–25 (2d Cir. 2002) (same).

14

crude oil deliveries are made subject to customer contracts that specify a quantity and pipeline injection point for the crude oil, but this is insufficient for the customers' "control" over the crude oil to render them the shipper. By this analysis, "if any entity in the chain of distribution intends to (and does) ship products across state lines, then any downstream distributors of those products to retailers necessarily intend those products to move in 'interstate commerce' under the MCA," but "the MCA does not apply that broadly, and the relevant intent of the original shipper to ship goods interstate does not reflexively apply to all shipments in the ensuing intrastate distribution of those products." *Foreman*, 950 F. Supp. 2d at 969 (citing *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 898 (7th Cir. 2009)). Ace's contracts with its customers are standard purchase agreements under which Ace agrees to provide a certain amount of a particular good at a specific location for a specific price, which are actions that all customers take (ROA.185–186, 335–336, 374); they do not rise to the level of control that courts recognize as determinative of "shipper" status. *See, e.g.*, *Glanville v. Dupar, Inc.*, No. H-08-2537, 2009 U.S. Dist. LEXIS 88408, at *5 (S.D. Tex. Sep. 25, 2009) (the "customer" maintained "real-time information about the movement of each appliance" as well as title to and control over the appliances throughout the relevant journey).

It is undisputed in this case that Ace purchases crude oil from oil fields, then handles the transport of that crude oil to specific pipeline injection points from which other entities retrieved the crude oil for purposes having nothing to do with Ace. (ROA.184–92, 335–36, 374–79, 401–405, 434–38, 464–69, 502–05). Ace decides which oil fields to purchase from, determines the mechanism for transport, assigns drivers for transport, bears the cost of the transport,[3] determines the routes of transport, and bears the risk associated with loss in transit, while Ace's customers merely expect a certain quantity of crude oil to be available at an injection point as a specific time. (ROA.184–92, 335–36, 374–79, 401–405, 434–38, 464–69, 502–05). Ace is inarguably the shipper of crude oil for the relevant part of the crude oil's journey, and it is Ace's "fixed and persisting intent" that is

---

[3]     Ace argues that it is actually its customers that bear the cost of transport "via their payments to Ace," but this is an absurdity. Appellant's Brief, p. 34. It is axiomatic that a post-performance payment for a service rendered is not bearing the cost of the service itself. Ace bears the cost of acquiring and maintaining trucks, obtaining and maintaining requisite insurance and licensures, and hiring and training drivers. That it can afford this with what it charges its customers does not shift the burden of the expenses to the customers. Further, Ace bears the risk of a failed delivery. Should a truck break down or spill its load of crude oil, Ace would be required to provide another load at its own expense. The customers would pay only for the crude oil received.

16

relevant to whether the crude oil moves in interstate commerce, despite any contractual obligations Ace has to its customers.

In *Raymond v. Mid-Bronx Haulage Corp.*, the defendant employed drivers to collect waste and deposit it at transfer stations in accordance with pre-existing contracts. 2017 U.S. Dist. LEXIS 50430, at *22–24. The court determined that, even though the deliveries were made pursuant to customer contracts and most of the waste eventually moved out of state, a question of fact remained as to the application of the MCA Exemption because the defendant could not establish that "an ultimate final destination was envisaged at the time the transportation commenced." *Id*. (quoting *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 224 (2d Cir. 2002)) (internal edits omitted). Notably, the court made this determination despite evidence from the defendant that it had specifically contracted with customers who moved the goods out of state in order to preserve the MCA Exemption. *Id*. at *21–22.

Likewise, in *Veney v. John W. Clarke, Inc.*, the District of Maryland determined that drivers who collected trash and recyclables and deposited them in dumping facilities in the same state were traveling exclusively intrastate because the "[d]efendants' transportation of property ends at the dump" and "[w]hat happens to the trash and recyclables after that is determined by someone else." 28

F. Supp. 3d at 444. "That it may wind up outside Maryland is of no moment to Defendants." *Id*.

Essentially, in both *Raymond* and *Veney*, the courts regarded the transfer of title, control over, and interest in the goods as a break in the continuity of the goods' movement in interstate commerce. The defendants controlled the goods only until the goods were deposited at a storage facility, from which the defendants' customers exerted control thereafter. This change of control and ownership was sufficient to render the waste's movement exclusively intrastate despite that much of it ultimately moved interstate. "Mere contemplation that property may be further shipped from where it was delivered does not amount to an original, persisting intention of a shipper that property is, in fact, to be shipped to another place." *Veney*, 28 F. Supp. 3d at 443. This analysis applies here where Ace collects and moves goods intrastate to a storage point where customers take title and control of the goods to move it out of state.

In *Texas v. United States*, this Court noted that a break in the movement of the goods will change its interstate character:

> It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment. If the shipment comes to rest *within the state of origin* and the goods are thereafter disposed of *locally*, the interstate character of the shipment is lost, but temporary stoppage within the state, made necessary in

> furtherance of interstate carriage, does not change its
> character.

866 F.2d 1546, 1559–60 (5th Cir. 1989) (quoting *Texas v. Anderson, Clayton &*

*Co.*, 92 F.2d 104, 107 (5th Cir. 1937)). This quote references scenarios in which

courts examine whether a stoppage of goods' movement is sufficient to break the

chain of interstate commerce when a local distributor collects the goods for the

"last leg" of the goods' interstate journey, but the same principles may be applied

to the scenario here in which Ace argues that it carries the crude oil on the "first

leg" of the crude oil's interstate journey.

In *Romero v. Fueltech Oil Service Corp.*, the Southern District of Florida

analyzed whether drivers for a fuel distribution service moved fuel in interstate

commerce when they collected oil from a terminal and distributed it locally. 2010

WL 11505519, at *3–4. The defendant argued that it was moving the fuel on the

"last leg" of the interstate journey, but the court disagreed, noting that although the

goods originated from out-of-state, the original shippers of the fuel merely

intended the fuel reach Florida, not that it reach each individual customer within

Florida. *Id*. Accordingly, the fuel's stoppage in the storage facilities broke the

fuel's interstate journey—the original shippers had no control or interest in the fuel

past the storage facility and the defendant-employer had no control or interest in

the fuel prior to the storage facility. *Id*. Thus, the defendant became the "shipper"

19

for the fuel's journey through Florida, and the defendant had no intent that it move beyond state lines after delivery to its customers. *Id*.

The same is true here, even though the crude oil's journey is at its origination rather than its termination. Ace has exclusive control and interest in the crude oil until it deposits the crude oil in the injection point, and Ace's customers have exclusive control and interest in the crude oil after it has been deposited. Accordingly, Ace is the shipper for this leg of the crude oil's journey, and it is Ace's intent regarding the crude oil that is relevant.

> ii.    *Ace did not have a "fixed and persisting intent" that the goods cross state lines.*

To determine the shipper's "fixed and persisting intent," a court looks to the totality of the circumstances. *Siller*, 1997 U.S. App. LEXIS 42893, at *5. The Court may consider a variety of factors, including the following:

> (1) whether a single shipper has control over both the inbound and outbound movements to and from the warehouse; (2) whether the shipments are made pursuant to specific orders or customer estimates of need which predict how much product will eventually be delivered to each customer; (3) how many customers the storage facility serves; (4) how rapidly the product moves through the storage facility; (5) whether the shipment is made pursuant to a storage-in-transit provision in an appropriate tariff; and (6) whether the product goes through additional processing or manufacture at the storage facility.

*Id*. at \*6 (internal citations omitted). Ultimately, all factors should be considered together to reach a conclusion based on the totality of the circumstances.

As detailed above, Ace's "fixed and persisting intent" is for the crude oil to reach the in-state injection points from which its customers retrieve their orders. Because Ace has no control over or interest in the crude oil's final destination, whether the crude oil crossed state lines after its injection is irrelevant to the analysis. Ace hyper-focuses on the District Court's use of the term "vested interest" as if the District Court was creating a specific test rather than using ordinary language to convey an idea, but courts have regularly examined a shipper's interest in the transported goods to determine whether it was the shipper's intent that the goods move in interstate commerce. *See* MSJ Order, ROA.647–649.

For example, in *Estrada v. Ecology Services Refuse and Recycling, LLC*, the District of Maryland noted that the defendant "loses any property *interest*" in the goods when it sells them to the entity that actually moved the goods out of state. Civil Action No. GLR-17-496, 2018 U.S. Dist. LEXIS 205184, at \*10-11 (D. Md. June 12, 2018) (emphasis added). In doing so, the court distinguished *Bilyou v. Dutchess Beer Distributors, Inc.*, the seminal Second Circuit case that noted the combined interest and ownership of the carrier and the shipper when concluding

21

that a driver moving exclusively intrastate was moving goods in interstate commerce. *Id*. (citing *Bilyou, Inc.*, 300 F.3d at 224).

Likewise, the *Veney* court noted that the defendants had "nothing to do with determining what the ultimate destination of the [trash and recyclables] is, *or [have] any interest in it*, or any duty to discharge in respect to it." 28 F. Supp. 3d at 444 (alterations in original; emphasis added). The *Veney* court cited to *Alice v. GCS, Inc.*, wherein the court noted that the defendant "no longer had an *interest in or control over* the refuse" after depositing the waste at a collection site." No. 05 C 50132, 2006 U.S. Dist. LEXIS 65498, at *12 (N.D. Ill. Sep. 14, 2006) (emphasis added).

In fact, control over and interest in the goods being moved is a vital factor in determining the goods' "essential character" pursuant to the shipper's fixed and persisting intent, as demonstrated by a wealth of case law.

For example, in *Glanville v. Dupar, Inc*., the appliance company GE contracted with the defendant to handle "last leg" deliveries to GE's customers. 2009 U.S. Dist. LEXIS 88408, at *5. In determining that the appliances were moving in interstate commerce, the court noted that GE "maintains real-time information about the movement of each appliance until it is delivered to the customer" and "retains title and control over all the appliances it ships until they are delivered to the customer." *Id*. at *4. Ownership of and control over the good

22

was vital to the court's analysis. *See id*. at *41 ("GE owns the Dallas ADC and bears ultimate responsibility for payment of transportation costs incurred.").

In *Galbreath v. Gulf Oil Corp*., the plaintiffs were drivers for the defendant ("Gulf Oil") who worked out of Gulf Oil's Atlanta, Georgia, plant. 413 F.2d 941, 941 (5th Cir. 1969). Although the drivers themselves did not cross state lines, all of the product transported by the drivers was shipped to Georgia by Gulf Oil via pipeline from various other states. *Id*. at 942. The pipeline itself was owned by a company in which Gulf Oil had a 14% ownership interest. *Id*. The drivers then retrieved the product in Georgia for in-state delivery to various customers. *Id*. at 943. The products delivered by the drivers were shipped by Gulf Oil to the Atlanta plant either pursuant to a customer contract or with a definite understanding—in fact a contract—to meet the needs of specified customers. *Id*. at 945. As part of this process, Gulf Oil "retained control over the products from the time they left the [out-of-state] refinery until they were delivered to the consumer." *Id*. at 947. In short, the plaintiffs were involved in "a connecting shipment moving partly by motor carrier and partly by pipeline." *Id*.

In *Craft v. Ray's, LLC*, the court determined that intrastate movement of waste products was movement of goods in interstate commerce because every entity involved in the transfer of the waste (including the carrier company, the trash service, the recycling and transfer station, and the scrap metal sorting facility)

were all owned and operated by related entities controlled by a single individual. No. 1:08-cv-627-RLY-JMS, 2009 U.S. Dist. LEXIS 90862, at *3, 6 (S.D. Ind. Sep. 29, 2009). Similarly, in *Bilyou*, the Second Circuit found that drivers who delivered beverages and collected empty bottles to return to the recycling company to be processed and shipped out-of-state were moving the empty bottles in the stream of commerce despite only driving intrastate in part because the bottling company and the recycling company were related entities. *Bilyou*, 300 F.3d 217, 224–25 ("Assuming Bilyou's argument might be valid if Mid-Hudson were an independent entity that purchased the empties at arm's length from DBD, that is not the case. Mid-Hudson and DBD are related entities and are not in an arm's length relationship to one another. They have common owners, share the same property, and arrange with one another the allocation of the benefits and burdens of handling the empties.").

There is no evidence of joint ownership or co-allocation of benefits and burdens between Ace and its customers. Ace exerts complete ownership of and control over the crude oil until it puts it into the hands of its customers. These circumstances are far more akin to the waste disposal cases cited above, wherein a waste retrieval company collects waste and deposits the waste into a collection point in the same state with no further interest in what happens to the waste from that point forward. *See Estrada*, 2018 U.S. Dist. LEXIS 205184, at *5–11;

24

*Raymond*, 2017 U.S. Dist. LEXIS 50430, at *22–24; *Veney*, 28 F. Supp. 3d at 443–44. As in *Estrada*, *Raymond*, and *Veney*, because Ace's interest in the crude oil ends at the in-state injection point, Ace's intent is for the crude oil to reach that point and no further. *See also Alice*, 2006 U.S. Dist. LEXIS 65498, at *12 ("[The defendant's] fixed and persistent intent was to unload its debris at Heartland, [the in-state sorting facility].").

In other words, Ace's interest and intent stops in Texas. *See Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 793 n.11 (3d Cir. 2016) (noting that "the mere intersection of a company's activity and interstate commerce is not enough to warrant application of the MCA exemption"); *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 255 (3d Cir. 2005) ("There is no general rule that once something (either passenger or freight) embarks on a journey that will eventually carry it between two states, every moment of that journey, through the last conceivable moment of travel, is necessarily interstate transport under the MCA."); *Collins*, 589 F.3d at 896–98 (recognizing the importance of the defendant's title to or control over the product as the product crossed state lines and distinguishing instances in which title passes prior to the product moving across state lines). Because Ace does not have a fixed and persisting intent that the crude oil cross state lines, its purely intrastate delivery of crude oil does not move in interstate commerce.

2.    <u>The District Court did not err in determining that Ace is the shipper and evaluating its intent with respect to the crude oil.</u>

As set forth above, the District Court's Order denying Ace's request for summary judgment as to the application of the MCA Exemption was not an erroneous application of law and its decision should be upheld by this Court. Whether expressly stated or not, the District Court clearly examined the totality of the circumstances to determine the essential character of the shipments, noting that Ace "purchased crude oil from producers and sold that oil to a Texas customer at a Texas location." *See* MSJ Order, <u>ROA.648</u>. Ace "had no vested interest[4] in the crude oil its drivers hauled crossing state lines" because Ace "earn[s] its revenue once it sells the crude oil to its customers." (<u>ROA.648</u>–49).

Accordingly, the District Court examined who controlled or owned the shipments of crude oil during the relevant portion of the crude oil's transport, found that entity to be the shipper, and examined that shipper's intent with respect

_____

[4]    The District Court's use of the term "vested interest" is as follows: "Unlike the cases it relies on, Ace had no vested interest in the crude oil its drivers hauled crossing state lines." MSJ Order, <u>ROA.648</u>. The District Court did not put the words in quotes or cite any case law from which it drew the term other than to reference the cases Ace relied on. (<u>ROA.648</u>). The District Court was very obviously referencing the wealth of case law that examines which entity has interest in goods to determine who is the shipper and not creating a rigorous new legal test.

to the crude oil's interstate movement to determine whether the crude oil was moving in interstate commerce. See MSJ Order, ROA.647–49. This is a correct application of relevant law; Ace merely disagrees with the District Court's findings of fact.

Ace's arguments on appeal rely on convoluted and ad hoc applications of law that are simultaneously too narrow and too broad, depending on the utility of interpretation to Ace. According to Ace, crude oil is a special good that cannot be warehoused or stored because it is in continuous movement via pipeline, and therefore the continuity of movement cannot be broken regardless of ownership or intent, how long the crude oil remains in the pipeline, or whether it comingles with other crude oil. But the applicable law loses all meaning and function if it cannot be applied to a specific good because of the good's nature. This Court must, as the District Court did, treat crude oil like any other good. Accordingly, this Court's answer to the District Court's first certified question must be "no, the transportation of crude oil, in and of itself, has exactly the same impact on interstate commerce for the purposes of the MCA Exemption as any other good."

Playing off this attempt to divorce relevant law from reality, Ace next argues that because, according to Ace, crude oil is incapable of being warehoused, no "fixed and persisting intent" analysis should apply because, again according to Ace, that test only applies in the super narrow and restrictive circumstance in

which a good is warehoused after being transported from another state. This interpretation again strips the law of all meaning and utility. Further, Ace denies that the Court should examine Ace's interest in the crude oil that it ships, despite the wealth of case law showing that the interest of an entity that ships goods in those goods is a vital factor in determining the interstate character of those goods.

Then, finally acknowledging that the relevant case law actually does apply in this case, Ace contends that any binding legal principle be applied to someone else who is not a party to this case. Essentially, Ace is asking this Court to create entirely new standards to meet its own exact factual circumstances, but this is not how legal precedent works. The District Court correctly applied the law to the factual evidence that Ace presented. Ace purchases crude oil from third parties and maintains ownership of and control over that crude oil while it transports the crude oil to a pipeline injection point in the same state. Because Ace has exclusive ownership of, interest in, and control over the crude oil during this leg of its journey, the District Court correctly determined that Ace is the shipper. Because Ace does not determine, or even know, the crude oil's final destination after the injection point and maintains no control over or interest in the crude oil after the injection point, the District Court correctly determined that Ace did not have a fixed and persisting intent that the crude oil cross state lines. Accordingly, the answer to the District Court's second certified questions should be as follows:

"Although no 'vested interest test' exists per se, courts do consider the relative interest in and control over a good when determining the identity of the shipper, whose fixed and persisting intent is then examined to determine the interstate nature of the goods."

Far from showing that the District Court erred in applying relevant law, Ace's assertions regarding the District Court's "errors" in fact show Ace's own misunderstanding and misinterpretation of the law as it applies to Ace. Ace argues that the District Court should not have cited to *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042 (5th Cir. 1976), because that case supports a review of "the intent of the interstate shippers—not the separate 'motor carriers' those shippers used 'for the shipments moving solely within Texas." Appellant's Brief, p. 36–37. Ace carries this argument into its assertions that the District Court misapplied *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786 (3d Circ. 2016) and *Packard v. Pittsburgh Transportation Co.*, 418 F.3d 246 (3d Cir. 2005). These arguments all stem from Ace's claim that it is not the shipper, despite the District Court's conclusion that Ace's interest in and control over the crude oil did, in fact, make it the shipper. *See* MSJ Order, ROA.647–49. Thus, the District Court correctly applied *Merchants*, *Mazzarella*, and *Packard* to determine Ace's intent because, according to the evidentiary analysis conducted by the District Court, Ace is the shipper.

Ace argues that the District Court erred in relying on a hypothetical from the Seventh Circuit case, *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895 (7th Cir. 2009), that outlines a scenario wherein the distribution of goods would be wholly intrastate if the wholesaler who received the goods exerted exclusive control over the goods during distribution. To begin with, it is not an error to rely on dicta from case law to bolster an opinion, particularly when that opinion is already otherwise well-supported. But regardless, the District Court made a factual determination that Ace's shipments of crude oil were exclusively within Ace's control and purview, exactly like the Seventh Circuit hypothetical. MSJ Order, ROA.647–49. The District Court correctly applied *Collins* to its factual determinations; Ace simply disagrees on the facts.

Finally, Ace's argument that the District Court's reliance on *Texas v. United States*, 866 F.2d 1546 (5th Cir. 1989), was error is somewhat ironic given its above assertion that any application of law should be highly technical and granular. *Texas* very explicitly states that goods that are shipped wholly within a state are distinguishable from goods shipped from one state to another, but the District Court recognized the underlying principles at play and correctly applied *Texas* and the other cases listed here in its determination that Ace's drivers moved goods solely intrastate. *See* 866 F.2d at 1559–60; MSJ Order, ROA.647–49.

30

Ultimately, Ace disagrees with the District Court's conclusion that Ace is the shipper whose intent with respect to the crude oil defines the crude oil's interstate character. This is not an error of law subject to appellate review; this is a proper application of law to a fact-finding with which Ace disagrees. The District Court's determination regarding whether the crude oil moved in interstate commerce should be upheld.

**D.    The District Court properly found that fact questions remained as to whether Plaintiffs had an expectation of interstate travel.**

Ace's arguments regarding Plaintiffs' expectations of interstate travel are inappropriately raised in this appeal. Under interlocutory appeal, this Court only has jurisdiction to review controlling questions of *law*; it does not review the District Court's findings of fact. *Easom*, 37 F.4th at 241 (citing Fed. R. Civ. P. 56). *See also Van Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 526 (5th Cir. 2022) ("Under § 1292(b), our court reviews de novo any controlling legal questions raised by a district court's certified orders."). Ace attempts to shoehorn in the District Court's determination that a fact issue remained as to Plaintiffs' expectation of interstate travel under the umbrella of "whether the MCA exemption from the FLSA's overtime pay requirements applies to Plaintiffs," but this question is too broad because it covers the District Court's analysis of evidence and findings of fact. Appellant's Brief, p. 17. This Court's review should be limited to the question of whether a "volunteer based interstate driving system create a

31

reasonable expectation of interstate travel" rather than a review of the District Court's careful and thorough analysis of the facts and evidence. Mem. and Order ("Certified Questions Order"), ROA.797.

1.  Whether an employee has an expectation of interstate travel depends on a review of the totality of the circumstances.

A driver who does not actually cross state lines may still be engaged in interstate commerce if the driver "is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties," if the driver "can be reasonably expected to perform interstate transport." *Rose v. Chem. Lime, Ltd.*, No. A-11-CV-854-LY, 2012 U.S. Dist. LEXIS 201093, at *6–7 (W.D. Tex. Feb. 29, 2012); *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 475 (5th Cir. 2010); 29 C.F.R. § 782.2(b)(3). In determining whether an employee could reasonably expect to perform interstate transport, Courts may consider the following list of non-dispositive factors:

> (1) whether all employees in the class have similar job duties, even if only some employees in the class make interstate trips; (2) whether the employer regularly sends some drivers to interstate destinations; (3) whether the employer requires its drivers to meet DOT requirements; (4) whether and with what frequency project assignments are subject to change; (5) whether the drivers' assignments are given via dispatch based on customer need; (6) whether drivers have fixed or dedicated routes; (7) whether assignments are distributed indiscriminately; and (8) whether drivers risk termination for refusing trips from dispatch.

32

*Olibas v. Barclay*, 838 F.3d 442, 449 n.11 (5th Cir. 2016). Further, "[t]he MCA exemption will not apply if 'the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis.'" *Id*. at 448.

Once again demonstrating its casual approach to binding law, Ace has self-servingly determined that any reasonable examination of the *Olibas* factors listed above could only result in a finding in Ace's favor, "as a matter of law." Appellant's Brief, p. 42. In reaching this conclusion, Ace again takes a highly technical approach that disregards the District Court's proper review of all the circumstances in favor of an unsupported strict balancing test.

2.    <u>The District Court properly considered all the evidence in its conclusion that Ace had not met its burden on summary judgment.</u>

Ace does not argue that the District Court misapplied law or relied on incorrect law; Ace merely argues that the District Court misevaluated the evidence because it did not rule in Ace's favor. Upon closer review, Ace's completely self-serving and decontextualized presentation of the evidence is no more convincing on appeal than it was before the District Court. The District Court properly considered all the evidence presented and its Order denying summary judgment should be upheld.

   *i.*  *The District Court's review of the evidence properly concluded that, taken with consideration of all the circumstances, the* Olibas *factors did not weigh in favor of Ace.*

Ace first takes issue with the District Court's finding that "only 26% of Ace's drivers have driven at least one interstate assignment in the past three years" because other courts have determined that as little as 2.75% interstate travel was sufficient to create a reasonable expectation, but this is a mischaracterization of both the fact evidence and the case law on which Ace relies. MSJ Order, ROA.649.

Plaintiffs demonstrated that the 26% Ace claimed was an inflated and verifiably false number with respect to Plaintiffs. *See generally*, Pl.'s Resp. to Def.'s Mot. for Summ. J. ("MSJ Resp."), ROA.524–30, 540–52. Based on trip summaries provided by Ace, Plaintiffs have shown that 0.7% of all interstate loads of crude oil originated from the Southern terminal where Plaintiffs were based, and interstate loads constituted a mere .03% of all loads for the Southern Terminal; the inflated 26% amount comes from Ace's inclusion of interstate trips and loads from the Eastern and Western terminals, which carried the bulk of interstate journeys because of these terminals' locations near the state lines. (ROA.524–30, 540–52). The unequal distribution of interstate trips among Ace's various terminals makes sense logistically and logically because it does not make sense to have a driver located at a terminal in the southern part of Texas drive a large truck to a producer's facility located across the western border of Texas if Ace has drivers

working out of a terminal that is closer to the producer's facility. Accordingly, Ace's data showing a significantly reduced number of interstate trips from the Southern terminal—as well as common sense—dictates that interstate trips were not assigned indiscriminately as applied to Plaintiffs.

This Court applied this principle in *Amaya v. Noypi Movers, L.L.C.*, when it noted that an employer must provide evidence of interstate commerce activity with respect to the particular subset of employees at issue rather than all employees as a whole. 741 F. App'x 203, 207 (5th Cir. 2018). Ultimately, the *Amaya* Court overturned the district court's finding of summary judgment because the employer had not provided sufficient evidence that "any of the workers in the plaintiff's class" were involved in interstate activities despite having shown that a significant portion of its employees as a whole participated in interstate activities.

Regardless, even accepting Ace's hyper-technical approach to the application of relevant law, 0.7% of all loads, and .03% of all loads for the Southern Terminal, are extremely low figures on their face and completely acceptable figures for the District Court to rely on to determine the infrequency of Plaintiffs' interstate travel. *See* MSJ Order, ROA.649. In *Kimball v. Goodyear Tire & Rubber Co.*, 504 F. Supp. 544, 548 (E.D. Tex. 1980), the court drew comparisons with *Coleman v. Jiffy-June Farms, Inc.*, 324 F. Supp. 664 (S.D.Ala.1970), aff'd, 458 F.2d 1139 (5th Cir.), cert. denied, 409 U.S. 948 (1972),

to find that the drivers were not subject to the MCA exemption. Particularly, *Kimball* pointed out that in *Jiffy-June Farms*, Alabama drivers made deliveries of poultry products within Alabama and to Florida. *Id*. The Florida deliveries were 0.23% of all deliveries, and even though they were made two to three times each week, the *Jiffy-June Farms* court "concluded that the interstate portion of the drivers' work was infinitesimal and thus did not exempt the employer from the FLSA." *Id*. The drivers in *Kimball* made even fewer interstate trips—0.17% occurring once every three weeks. *Id*. Accordingly, the *Kimball* drivers also did not qualify for the MCA exemption.

The percentage of total interstate loads for Ace's Southern terminal drivers is lower than in *Kimball* and *Jiffy-June*, and in fact occurred far less frequently. Ace's records show that Southern terminal drivers only made two interstate loads in 2019, six in 2020, one in 2021, and thirteen in 2022. *See* MSJ Resp., ROA.529, 540–52. As in *Kimball* and *Jiffy-June*, which involved weekly trips or trips every three weeks, this is far too infrequent for Plaintiffs to have "reasonably expected" to make any interstate trips. *See Watts v. Oil Patch Water & Sewer Services, LLC*, 4:13-cv-01176, Opinion on Partial Judgment, p. 2, Doc. No. 36 (S.D. Tex., Filed Feb. 4, 2015) (unpublished) (noting that "the test is a reasonable expectation, not a mere possibility"). Accordingly, the District Court did not err in determining that

the infrequency of interstate travel from the Southern terminal did not weigh in favor of Ace, nor did it misapply binding law with respect to its finding.

Ace next attacks the District Court's reliance on *Butcher v. TSWS, Inc*., Civil Action No. 4:10-CV-01376, 2011 U.S. Dist. LEXIS 95440, at *15–16 (S.D. Tex. Aug. 25, 2011), arguing that the factual disparities render the case useless for the District Court's review. To begin with, this is yet another hyper-technical analysis of how to apply relevant law: it is axiomatic that no case law will exist with the exact facts and circumstances present in the current case, but courts in general and the District Court in particular are well-versed in applying the legal ideas and principles underlying the holdings in cases with slightly dissimilar fact patterns. Indeed, the facts Ace chooses to highlight do not have the same significance on this case as do the similarities. The District Court noted that Ace, like the defendant in *Butcher*, allowed its drivers to volunteer for interstate trips, which creates a question of fact as to the drivers' expectation of interstate travel. MSJ Order, ROA.649. Ace disputes that the interstate trips were "voluntary" because trips were ostensibly assigned should no driver volunteer, but critically, Ace never presented evidence that such an assignment ever occurred. Again, Ace's dispute is not with the District Court's application of law but with its factual determination that Ace had a volunteer system of interstate travel.

37

> ii.   The District Court did not err in concluding Ace's "other
> undisputed evidence" was insufficient to meet its burden
> on summary judgment.

Finally, Ace argues that the District Court erred in not heavily relying on the "other undisputed evidence" Ace presented in favor of summary judgment. Appellant's Brief, p. 48. This "other evidence" includes offer letters to the Plaintiffs that stated they could be required to travel across state lines and Plaintiffs' deposition testimony stating that they were aware of the possibility of interstate travel duties. (ROA.345-55, 399-400, 431-32, 462-63, 496-500). The District Court properly concluded that these evidentiary items hold little weight when compared to the reality of Plaintiffs' working conditions.

To begin with, the offer letters are of little value because an employer's own pre-employment characterization of an employee's working conditions is insufficient to establish that the employee expected interstate driving assignments—only the reality of his working conditions is relevant. *See Allen*, 755 F.3d at 283–88 (noting that in proving the interstate commerce requirements, "neither the name given to his position nor that given to the work that he does is controlling," but rather "what is controlling is the character of the activities involved in the performance of [the employee's] job" (internal editing marks in original)) (citing 29 C.F.R. § 782.2(a), (b)(2); *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707 (1947)); *Songer v. Dillon Res., Inc.*, 636 F. Supp. 2d 516,

524–25 (N.D. Tex. 2009) (requiring "concrete evidence" of the carrier's involvement in interstate commerce); *Harrison v. Delguerico's Wrecking & Salvage*, No. 13-5353, 2016 U.S. Dist. LEXIS 75955, at *12–18 (E.D. Pa. June 10, 2016) (requiring "actual evidence" that employees made or were subject to making interstate trips). Because Ace's characterizations of the work Plaintiffs were expected to do have no impact on whether their actual job duties qualified them for the MCA exemption, the offer letters are irrelevant and were properly considered as being of little value by the District Court. *See* MSJ Order, ROA.649 ("Finally, the record shows that although Ace's crude oil drivers signed employment offer letters that included language stating that the drivers might be assigned both intra- and interstate routes, the offer letters were not 'a contract of employment.'").

Likewise, the District Court properly disregarded Plaintiffs' deposition testimony agreeing that they reasonably expected to travel across state lines is inadequate. The testimony relied upon is wholly based on the irrelevant language of the offer letter described above. (ROA.399-400, 431-32, 462-63, 496-500). More importantly, Plaintiffs cannot simply waive their rights to the protections of the FLSA as Ace argues Plaintiffs have done here. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704, 707 (1945); *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1235 (M.D. Fla. 2010) ("FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the

legislative policies it was designed to effectuate." (internal quotation marks omitted)). An employee's "agreement" that he or she meets the qualifications for an exemption is no different than a prohibited waiver of FLSA protections. *See Cunningham v. Mission Support All., LLC*, No. 4:18-CV-5060-RMP, 2019 U.S. Dist. LEXIS 243470, at *25 (E.D. Wash. July 22, 2019) (rejecting the employer's argument that the employees agreed they were exempt employees in a collective bargaining agreement because "FLSA rights cannot be abridged by contract or otherwise waived" and "congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement"); *Pineda v. Frisolino, Inc.*, 2017 U.S. Dist. LEXIS 139735, at *30 (S.D.N.Y. Aug. 29, 2017) (noting that a "mistaken belief or misunderstanding of the law is not a valid defense to an FLSA overtime claim" because FLSA rights cannot be waived). Accordingly, Plaintiffs cannot simply "agree" that they meet the qualifications for a particular exemption, which is what Ace is asking this Court to hold.

Importantly, Ace neglected to mention that the District Court was also presented with evidence that even if the District Court determined Plaintiffs had a reasonable expectation of interstate travel, the MCA Exemption would only apply for a fractional portion of Plaintiffs' employment. MSJ Resp., ROA.530. Courts impose a "four-month rule" on proof related to the MCA exemption, which requires that the employer "must demonstrate not only that it engaged in interstate

commerce within every four-month period but also that [the employee] either participated in that activity or could reasonably have been expected to do so." *Harrison v. Lazer Spot*, Inc., No. 1:20-CV-01200, 2021 U.S. Dist. LEXIS 238907, at *9 n.6 (M.D. Pa. Dec. 14, 2021); *See also Songer v. Dillon Res., Inc.*, 636 F. Supp. 2d 516, 524 (N.D. Tex. 2009) (applying the four-month rule); *Walters v. Am. Coach Lines of Miami*, No. 07-22000-CIV-UNGARO/SIMONTON, 2009 U.S. Dist. LEXIS 137229, at *4 (S.D. Fla. June 1, 2009).

Even if the annual interstate transport by a driver at the Southern terminal was sufficient to support the conclusion that Plaintiffs reasonably expected to make an interstate transport, the four-month rule would still bar the exemption for all time except for the four-month period following the single interstate transport. As noted above, Southern terminal drivers only made two interstate loads in 2019 (all made by one driver), six in 2020 (all made by one driver), one in 2021 (all made by one driver), and thirteen in 2022 (ten made by one driver and three made by a second driver). See MSJ Resp., ROA.530, 540–52. Clearly, if only a single driver at the Southern terminal makes only one or two interstate transport in a year, Plaintiffs cannot qualify for the MCA exemption for four to eight months out of each of those years because of the application of the four-month rule. That being said, even when there were thirteen loads for the year out of the Southern terminal, Ace provided no proof regarding when those transports occurred, meaning that a

41

reasonable finder of fact would have to resort to pure speculation to determine whether those trips occurred in different four-month periods. In sum, even if the District Court had disagreed with all of Plaintiffs' arguments dismantling Ace's evidence, the District Court would still be required to hold that Ace failed to meet its burden of proving the MCA exemption in eight out of twelve months each year.

### iii. The totality of the evidence clearly demonstrates that Ace did not meet its burden on summary judgment "as a matter of law."

As described above, Ace's interpretation of the record evidence in this case does not comport with reality. The District Court was presented with all the evidence presented by Ace on appeal as well as Plaintiffs' dismantling of that evidence, and properly concluded that Ace had not definitively proven that no fact question remained as to Plaintiffs' expectation of interstate travel. MSJ Order, ROA.649.

Ace's argument that the District Court could have ruled in its favor even though some of the *Olibas* factors weighed in Plaintiffs' favor is well-taken. The District Court did exactly that—the District Court found that while some of the *Olibas* factors weighed in Ace's favor, the totality of the circumstances demonstrated that Ace had not met its burden on summary judgment. This is true regardless of whether the factfinder is judge or jury, regardless of Ace's arguments otherwise. Ace's argument that the District Court should have ruled in its favor on

42

summary judgment ignores the District Court's ruling that the evidence was both "inconclusive and conflicting." MSJ Order, ROA.649. If the evidence is inconclusive, then obviously the District Court is in no position to enter a summary judgment ruling in Ace's favor.

Ace's reference to cases indicating that a court "may" rule on summary judgment where multi-factor tests are concerned is not a mandate that a court "must" so rule, particularly when the evidence presented is inconclusive as it is in this case. Plaintiffs thoroughly explained the ways in which Ace's evidence was not only insufficient as a whole but also vague with respect to its individual components, including analysis of Ace's data reflecting that interstate loads constituted a mere 0.03% of all loads for Ace's Southern terminal where Plaintiffs worked. (ROA.524–530, 540–52). It defies logic to suggest that Plaintiffs had a reasonable expectation of traveling in interstate commerce under these circumstances. Especially given that the test is one of the totality of the circumstances, the District Court ruled correctly in denying Ace's request for summary judgment on this issue.

In addition, Ace's assertion that it provided a "complete factual record" upon which the District Court could rule is inaccurate. In fact, Ace's records of interstate trips provided no information regarding which employees made interstate trips—facts which are relevant to whether Ace indiscriminately assigned interstate

trips.[5] (ROA.356–370, 540–52). Questions remain regarding Ace's assignment of interstate trips and whether Plaintiffs reasonably expected to be called upon to drive in interstate commerce—not whether Plaintiffs subjectively believed they could be called upon to drive in interstate commerce, but whether the facts of this case dictate the objective belief that Plaintiffs could be called upon to drive in interstate commerce. In fact, Ace failed to present evidence with respect to whether Plaintiffs or any drivers out of the Southern terminal were *ever* assigned an interstate route rather than accepting the routes voluntarily.

Ultimately, Ace's arguments concerning the District Court's "errors" with respect to whether Plaintiffs had a reasonable expectation that they may be required to travel out-of-state amount to a dispute regarding the District Court's interpretation of the facts rather than its application of law. The District Court weighed the evidence presented and determined that Ace had not met its burden on summary judgment; that Ace disagrees is not grounds to overturn the Court's Order. Accordingly, the answer to the District Court's third certified question should be "no, a volunteer-based interstate driving system does not create a

---

[5]    This information was contained in the records produced by Ace during discovery, but Ace redacted all names except those of Plaintiffs so that the District Court could not make that determination.

reasonable expectation of interstate travel." The District Court's Order denying summary judgment to Ace should be upheld.

## CONCLUSION

Ace's appeal rests on a convoluted reading of both established precedent and the District Court's application of that precedent to the facts of this case. Whether an employee is covered under the MCA Exemption is not a novel nor a confusing analysis, although certain facts of any given case may make the review more difficult. In denying Ace's request for summary judgment, the District Court applied the proper standard to the facts of this specific case and reached a correct conclusion. That Ace did not agree with the District Court's findings do not make those findings erroneous, nor is its disagreement with the District Court's analysis grounds for reversal. Accordingly, this Court should uphold the District Court's Order denying summary judgment to Ace.

Respectfully submitted,

**PLAINTIFF-APPELLEE
ELIZABETH ESCOBEDO**

FORESTER HAYNIE, PLLC
400 North Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: (214) 210-2100

By:   */s/ Colby Qualls*
Colby Qualls
Ark. Bar No. 2019246
cqualls@foresterhaynie.com

45

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing APPELLEE'S BRIEF complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and 5th Cir. R. 5, the brief contains 10,680 words, as determined by the word count function of Microsoft Word. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in font size 14 and font style Times New Roman.

*/s/ Colby Qualls*
**Colby Qualls**

## CERTIFICATE OF SERVICE

I, Colby Qualls, do hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on the date imprinted by the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, which will provide notice to the following attorneys of record:

Mark D. Temple, Esq.
mtemple@bakerlaw.com
Peter J. Stuhldreher, Esq.
pstuhldreher@bakerlaw.com
Paul M. Knettel, Esq.
pknettel@bakerlaw.com

BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717

*/s/ Colby Qualls*
**Colby Qualls**