No. 23-20494
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

**ELIZABETH ESCOBEDO,**

*Plaintiff-Appellee,*

**v.**

**ACE GATHERING, INCORPORATED,**

*Defendant-Appellant.*
_____

On Appeal from the United States District Court for the Southern
District of Texas, No. 4:22-cv-538
_____

**PETITION FOR REHEARING *EN BANC***
_____

Colby Qualls
Katherine Serrano
FORESTER HAYNIE, PLLC
400 North Saint Paul St.
Suite 700
Dallas, TX 75201
(214) 210-2100
cqualls@foresterhaynie.com
kserrano@foresterhaynie.com

Jennifer L. Mascott*
R. Trent McCotter
  *Counsel of Record*
SEPARATION OF POWERS CLINIC
COLUMBUS SCHOOL OF LAW
THE CATHOLIC UNIVERSITY OF
  AMERICA
3600 John McCormack Rd.
Washington, DC 20064
(202) 706-5488
mccotter@cua.edu

*Counsel for Plaintiff-Appellee*

* Admitted in Virginia and
Maryland

# CERTIFICATE OF INTERESTED PERSONS

*Escobedo v. Ace Gathering, Inc.*
No. 23-20494

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Elizabeth Escobedo

2.  Jamey Alaniz

3.  Matias Martinez

4.  Gene Lewis

5.  Ace Gathering, Inc.

6.  Arch Insurance Group, Inc.

7.  Colby Qualls

8.  Katherine Serrano

9.  Forester Haynie PLLC

10. Jennifer L. Mascott

11. R. Trent McCotter

12. Separation of Powers Clinic, Columbus School of Law, The Catholic University of America

13. Josh Sanford

14. Sanford Law Firm, PLLC

15. Jim Adler

16. Jim Adler & Associates

17. Mark D. Temple

18. Peter J. Stuhldreher

19. Paul M. Knettel

20. Baker & Hostetler, LLP

Dated: August 12, 2024      /s/ R. Trent McCotter

R. Trent McCotter
*Counsel for Plaintiff-Appellee*

# INTRODUCTION AND RULE 35(B)(1) STATEMENT

Judge Oldham's panel concurrence aptly described this Court's precedents on the Motor Carrier Act ("MCA") exemption to the Fair Labor Standards Act's ("FLSA") overtime requirements as "confusi[ng]" and "incoherent," with "multiple, unmanageable standards," including a six-factor test for an employer's intent and an "eight-factor balancing test" for an employee's intent. Slip.Op.11–13 (Oldham, J., concurring in judgment).

The confusion appears to arise from the Court's continued application of caselaw and a Department of Labor ("DOL") rule that are 50 years out of date, harkening back to statutory language that Congress deleted in 1978. Ironically, Congress's statutory revisions were likely prompted *because* courts were misinterpreting the prior statutory text, so Congress wanted to make clear those decisions were far too broad. This Court's reliance on the DOL rule is misplaced for the additional reason that the Secretary of Transportation, not DOL, has authority here.

The Court should grant *en banc* rehearing to revisit its morass of confusing tests based on old statutes and rules. As Judge Oldham argued, the Court should instead look to the "text" of the relevant statutes, which

the Supreme Court has made clear "is king when it comes to overtime rules." Slip.Op.13 (Oldham, J., concurring in judgment).

And as explained below, the text of the MCA and FLSA themselves establishes a straightforward list of motor carrier employees covered by the MCA Exemption, based on whether they cross a state, national, or territorial border (or are on particular Indian reservations)—none of which applies to Plaintiff here, who drove only intrastate routes within Texas. Because she did not "cross[] state lines," the MCA Exemption "does not apply and [defendant] must comply with the Fair Labor Standards Act's overtime pay rules." *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 259 (3d Cir. 2005) (Nygaard, J., concurring in judgment).

"[W]hether [her] employment would fall within the [old] statutory definition [and the Supreme Court caselaw interpreting it] is irrelevant, as that definition no longer exists in the United States Code. What *does* exist is the present-day jurisdictional statute, the plain language of which resolves this appeal without the need for resort to regulatory definition or case law." *Id.* at 260.

Undersigned counsel certifies that this issue is worthy of *en banc* rehearing. The Court has previously granted *en banc* rehearing on the

interpretation of other FLSA overtime exemptions, *see, e.g., Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289 (5th Cir. 2021) (*en banc*), and this case presents an ideal vehicle for this Court to adjust its precedent on the MCA Exemption to reflect the current text of the FLSA and MCA, which provides an easily administrable rule that would foster early resolution of overtime claims.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS........................................... i

TABLE OF AUTHORITIES ..................................................... vii

STATEMENT OF ISSUE MERITING REHEARING *EN BANC*............ 1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
　　DISPOSITION OF THE CASE........................................... 1

　I.　Background Facts and District Court Proceedings ................ 1

　II.　Fifth Circuit Proceedings........................................ 2

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT............ 3

ARGUMENT ..................................................... 3

　I.　The Text of the Relevant Statutes Excludes Plaintiff from
　　the MCA Exemption—And Thus She Is Entitled to FLSA
　　Overtime...................................................... 3

　II.　The Origins of this Court's "Confusing" and "Incoherent"
　　Precedent..................................................... 7

　　A.　The History of the MCA Exemption—and Its
　　　Misinterpretation........................................... 8

　　B.　What Went Wrong?...................................... 13

　　C.　The Plain-Text Answer Is Straightforward. ................ 17

　III.　This Case Is Worthy of *En Banc* Rehearing.......................... 17

CONCLUSION..................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Coil Tubing Servs., LLC,*
   755 F.3d 279 (5th Cir. 2014)..........................................................14, 15

*Carley v. Crest Pumping Techs., LLC,*
   890 F.3d 575 (5th Cir. 2018).................................................................. 12

*Hewitt v. Helix Energy Sols. Grp., Inc.,*
   15 F.4th 289 (5th Cir. 2021)............................................................. v, 17

*Merchants Fast Motor Lines, Inc. v. ICC,*
   528 F.2d 1042 (5th Cir. 1976)................................................................. 9

*Packard v. Pittsburgh Transp. Co.,*
   418 F.3d 246, 259 (3d Cir. 2005) .....................................iv, 5, 6, 16–18

*Shew v. Southland Corp.,*
   370 F.2d 376 (5th Cir. 1966)............................................................9, 10

*Siller v. L&F Distribs., Ltd.,*
   109 F.3d 765 (5th Cir. 1997)................................................................... 7

*Songer v. Dillon Resources, Inc.,*
   618 F.3d 467 (5th Cir. 2010)................................................................ 14

*Texas v. United States,*
   866 F.2d 1546 (5th Cir. 1989)............................................................. 14

*United States v. Capital Transit Co.,*
   338 U.S. 286 (1949)................................................................................ 14

*Walling v. Jacksonville Paper Co.,*
   317 U.S. 564 (1943)................................................................................. 9

*White v. U.S. Corrections, LLC,*
   996 F.3d 302 (5th Cir. 2021)................................................................... 3

**Statutes**

29 U.S.C. 207.............................................................................. 3

29 U.S.C. 213.............................................................................. 4

49 U.S.C. 3102.......................................................................... 12

49 U.S.C. 13501.....................................................................5, 11

49 U.S.C. 13501........................................................................ 17

49 U.S.C. 31502....................................................................4, 12, 17

49 Stat. 543 (1935)................................................................... 8, 9

52 Stat. 1067 (1938)..................................................................... 8

92 Stat. 1337 (1978)................................................................... 11

**Other Authorities**

29 C.F.R. 782.2........................................................................... 9

13 Fed. Reg. 2346 (Apr. 30, 1948)............................................. 10

H.R. Rep. 95-1395, 1978 U.S.C.C.A.N. 3009 (1978)................. 10

## STATEMENT OF ISSUE MERITING REHEARING *EN BANC*

Whether motor carrier employees who transport goods or passengers exclusively intrastate fall within the Motor Carrier Act Exemption to the Fair Labor Standards Act's general overtime rules.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

## I. BACKGROUND FACTS AND DISTRICT COURT PROCEEDINGS

Plaintiff represents a putative class of tanker-truck drivers ("crude haulers") employed by Defendant Ace Gathering, Inc. Slip.Op.2. The crude haulers currently part of the case all transported oil from the oil fields to injection points for pipelines, which all occurred within Texas, meaning their duties "never took them beyond state lines." *Id.*

Plaintiff sued for unpaid overtime wages under the Fair Labor Standards Act, which (as described below) contains an exemption for certain employees covered by a provision within the Motor Carrier Act. Slip.Op.3. The District Court initially denied Defendant's motion for summary judgment, finding there were material disputes about the crude haulers' reasonable expectation of driving across state lines. *Id.*

But the District Court, on a motion for reconsideration, certified relevant questions for interlocutory appeal, aimed at determining the proper test for the MCA Exemption to the FLSA's overtime rules. *Id.*

## II.  FIFTH CIRCUIT PROCEEDINGS

A panel of this Court held that its precedents on the MCA Exemption looked to whether the employees engaged in interstate commerce as defined under the MCA. Slip.Op.5. Although the MCA originally defined that concept narrowly (this is explained in much more detail below), courts had nonetheless expanded it, leading to "line-drawing problems and, alas, various multifactor balancing tests." Slip.Op.6. The panel concluded that because the oil that the crude haulers transported was ultimately bound, in large part, to go out of state, the purely intrastate transportation of that oil was nonetheless within the scope of the MCA Exemption—and thus Plaintiff was not covered by the FLSA's overtime rules. Slip.Op.7.

Judge Oldham concurred in the judgment. He pointed out that the old caselaw was outdated because the statutory text had been amended in 1978 to remove the reference to "interstate commerce." Slip.Op.11–13 (Oldham, J., concurring in judgment). He also suggested the old cases

had misconstrued the MCA anyway, and the Court's continued reliance on a Department of Labor rule last revised in 1971 only "[a]dd[ed] confusion to incoherence." Slip.Op.12.

Over the years, the Court had "devised multiple, unmanageable standards for making overtime decisions" in this context, contrary to the "text" of the relevant statutes, which "is king when it comes to overtime rules." Slip.Op.12–13. "Incoherent as they may be, the precedents bind us. So I concur in the judgment." Slip.Op.13.

## STATEMENT OF FACTS NECESSARY TO THE ARGUMENT

No additional facts are necessary to the argument of the issues.

## ARGUMENT

### I. THE TEXT OF THE RELEVANT STATUTES EXCLUDES PLAINTIFF FROM THE MCA EXEMPTION—AND THUS SHE IS ENTITLED TO FLSA OVERTIME.

The Fair Labor Standards Act establishes overtime-pay requirements, 29 U.S.C. 207, but exempts certain employees. The employer has the burden of demonstrating an exemption applies. *White v. U.S. Corrections, LLC*, 996 F.3d 302, 307 (5th Cir. 2021).

The relevant exemption here covers employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions

of section 31502 of Title 49." 29 U.S.C. 213(b)(1). This is commonly referred to as the "MCA Exemption."

The scope of the Secretary of Transportation's "power" under Section 31502 extends to setting qualifications and maximum hours for "employes" of motor carriers and certain private motor carriers, but the statute contains an express limitation on that power: it *only* "applies to transportation (1) described in sections 13501 and 13502 of this title; and (2) to the extent the transportation is in the United States and is between places in a foreign country, or between a place in a foreign country and a place in another foreign country." 49 U.S.C. 31502(a).

Following those cross-references: Section 13501, in turn, says the Secretary has jurisdiction "over transportation by motor carrier" but *only* "to the extent that passengers, property, or both, are transported by motor carrier" between a list of specific locations, all of which (with one exception regarding reservations) require crossing a state, national, or territorial boundary. The complete list:

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

49 U.S.C. 13501.

Section 13502—the other provision cross-referenced in Section 31502(a)—sets special rules for Alaska not relevant here. And the two types of transportation expressly listed in Section 31502(a)(2) itself also necessarily require crossing a national border.

*Taken together*, this means the Secretary's power under Section 31502 (and thus the scope of the MCA Exemption) extends only to motor carrier employees whose transportation *actually* crosses a state, national, or territorial border (or onto certain Indian reservations). *See Packard*, 418 F.3d at 259 (Nygaard, J., concurring in judgment).

As explained below in the statutory history section, Congress apparently adopted this specific list of cross-border trips after courts had

overbroadly construed prior statutory text referencing "interstate or foreign commerce."

The panel here correctly noted that Plaintiff traveled exclusively within Texas, moving oil from fields in Texas to a pipeline entry point in Texas. Because she did not cross a state, national, or territorial border (the Indian reservation exception is not at issue), she does not fall within any of the specific forms of transportation listed in Section 31502(a), including its cross-references to Sections 13501 and 13502. The Secretary of Transportation did not have power to set her hours—and thus she does *not* fall within the MCA Exemption.

The correct framework for the MCA Exemption itself is thus relatively straightforward: Does the motor carrier employee actually transport people or good across a U.S. state, national, or territorial border, or in certain Indian reservations? If yes, she is covered by the MCA Exemption and thus is not covered by the FLSA's overtime rules. If not (as here), she is covered by the FLSA overtime rules. *Packard*, 418 F.3d at 259 (Nygaard, J., concurring in judgment) (proposing adoption of this text-based boundaries test).

## II. THE ORIGINS OF THIS COURT'S "CONFUSING" AND "INCOHERENT" PRECEDENT.

Rather than following the revised text of the MCA, this Court's precedents have developed a confusing set of tests to determine whether motor carrier employees fall within the MCA Exemption despite working exclusively intrastate. For example, the Court sometimes invokes a six-factor test for whether there is a "fixed and persisting intent of the shipper" to implicate interstate commerce, or an eight-factor test for whether employees themselves have a "reasonable expectation" of interstate transportation of the relevant goods. Slip.Op.12 (Oldham, J., concurring in judgment) (listing authorities); *see Siller v. L&F Distribs., Ltd.*, 109 F.3d 765, *1 (5th Cir. 1997).

Given this Court's strict rule of orderliness, the panel evaluated this case (and parties briefed it) under that framework. But on rehearing *en banc*, the parties and Court are free to re-evaluate the issue based on the actual statutory text, as Judge Oldham suggested.

The origins of the Court's morass of tests are almost as complicated as the tests themselves, but explaining how we got here is helpful to understanding why this Court's current tests are so wrong.

**A.** **THE HISTORY OF THE MCA EXEMPTION—AND ITS MISINTERPRETATION.**

When first enacted in 1938, the FLSA provided that its overtime-pay rule "shall not apply with respect to … any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935." 52 Stat. 1067, 1068 (1938).

In turn, Section 204 of the MCA in 1935 stated the Interstate Commerce Commission ("ICC") could "regulate common carriers by motor vehicle" and "to that end the Commission may establish" qualifications and maximum hours "of employees." 49 Stat. 543, 546 (1935). The term "common carriers by motor vehicle," in turn, was defined as anyone who "undertakes … to transport passengers or property … in interstate or foreign commerce by motor vehicle for compensation." *Id.* at 544. And "interstate commerce," in turn, was defined as "commerce between any place in a State and any place in another State or between places in the same State through another State." *Id.* Foreign commerce was similarly defined as "commerce between any place in the United States and any place in a foreign

country, or between places in the United States through any foreign country." *Id.*

Those definitions suggest Congress was limiting the ICC to regulating common carrier employees whose transportation crossed a state or foreign border. Slip.Op.11 (Oldham, J., concurring in judgment).

But courts often failed to adhere to that scope, instead broadly construing the ICC's jurisdiction in this realm as encompassing employees who were involved in intrastate transportation of goods or passengers that had originated out of state or were ultimately headed out of state. These Courts almost never quoted or cited the actual statutory definitions. *See, e.g., Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943); *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976); *Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966).

In 1948, the Department of Labor issued an interpretive rule that partially parroted the MCA, saying the MCA Exemption required that motor carrier employees engage in transportation "in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. 782.2(a)(2). That rule was last revised in 1971, although its

substance has barely changed since 1948. 13 Fed. Reg. 2346 (Apr. 30, 1948).

Congress noticed that courts were construing too broadly the phrase "interstate or foreign commerce" as used in the MCA. Indeed, this very Court flagged that the judicially-expanded scope of the MCA Exemption was causing an "intramural conflict between the Department of Labor and Interstate Commerce Commission as to jurisdiction over an employee [who does not cross a border], which will ultimately have to be clarified and resolved by Congress." *Shew*, 370 F.2d at 378.

In 1978, Congress heeded this Court's call and revised the relevant provision for "clarity." H.R. Rep. 95-1395, at 59, 1978 U.S.C.C.A.N. 3009, 3068 (1978) (explaining why this specific provision was changed). Rather than tie ICC jurisdiction to "interstate or foreign commerce," Congress now provided that the ICC had jurisdiction over employees only "to the extent that passengers, property, or both" are transported between a set list of covered locations—*all of which* expressly required crossing a state, national, or territorial border (except for a provision about Indian

reservations). 92 Stat. 1337, 1361–62 (1978).[1] That list is the same that currently appears at 49 U.S.C. 13501, which is incorporated into the relevant FLSA overtime-exemption provision.

Thus, Congress limited the ICC's scope in two ways: *first*, moving away from the misconstrued phrase "interstate or foreign commerce," Congress provided that only certain trips would qualify, and they *all* required crossing a border (or were on certain Indian reservations); and *second*, by using "to the extent that" when describing those cross-border trips, Congress was eliminating consideration of what happened before or after the identified cross-border trip itself (e.g., if the product had been transported previously by a different employee who moved only intrastate).

---

[1] The ICC now had jurisdiction only "to the extent that passengers, property, or both, are transported by motor carrier— (1) between a place in— (A) a State and a place in another State; (B) a State and another place in the same State through another State; (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States; (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and (2) in a reservation under the exclusive jurisdiction of the United States or on a public high way." 92 Stat. at 1361–62.

Congress was likely trying to return the statute to what it had *always* been intended to cover—but which the courts had improperly broadened over time. By listing every permutation of cross-border trip, Congress left a marker that no one could miss, making pellucidly clear that purely intrastate transportation of products or passengers would *not* be covered simply because they may originally have come from or ultimately were headed to another state. When an employee actually did transport products or passengers across a border, *that* employee would be covered by the MCA Exemption.

In 1983, Congress added a provision at 49 U.S.C. 3102 (now at 49 U.S.C. 31502) authorizing the Secretary of Transportation (rather than the ICC, which was abolished) to regulate the hours of employees of motor carriers, but again only to the extent transportation was covered by one of the specified forms requiring a border crossing (and the Indian reservation clause).

This yielded essentially the same statutory scheme we see today.[2] The FLSA itself was also modified to reflect the transfer of authority from

---

[2] In 2008, Congress enacted further exclusions related to smaller vehicles, but those are not relevant here. *See Carley v. Crest Pumping Techs., LLC*, 890 F.3d 575 (5th Cir. 2018).

the ICC to the Secretary of Transportation, as well as the change in codification locations, but otherwise the FLSA exemption has remained the same since it was first enacted.

## B.  WHAT WENT WRONG?

It appears this Court's multi-factor, confusing tests on the MCA Exemption arise from continued reliance on caselaw from before 1978, when Congress changed the relevant statutory text to delete the reference to "interstate or foreign commerce." It didn't help that the old cases themselves probably had improperly construed the MCA even as it existed pre-1978.

Rather than focusing on the new list of employee transportation requiring a border crossing, the Court continued to cite its old cases asking whether an employee is sufficiently involved in interstate commerce despite not crossing a border. Thus, the Court still looks to a product's "practical continuity of movement," Slip.Op.7, and whether employees or carriers were "intending" or "expecting" their shipments to continue across state or national borders even when none of the employees actually crossed a border, Slip.Op.12 (Oldham, J., concurring in judgment).

The disconnect is especially jarring when one considers that many of the pre-1978 cases did not even arise in the FLSA context and relied on definitions and cases that pre-dated even the 1930s enactments of the MCA and FLSA. Slip.Op.8 (noting one of the common tests dates to 1922); *United States v. Capital Transit Co.*, 338 U.S. 286 (1949) (citing such cases); *Texas v. United States*, 866 F.2d 1546, 1556 n.5 (5th Cir. 1989) (same).

Further, the Court latched onto the 1948 DOL rule and followed it as if it were a statute, even though it had likewise been overtaken by the 1978 statutory revisions. *See, e.g., Allen v. Coil Tubing Servs., LLC*, 755 F.3d 279, 283 (5th Cir. 2014); *Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 472–74 (5th Cir. 2010).

In short, it appears Congress revised the statute because courts were misinterpreting it—and the courts' response was to continue interpreting it the same as they always had, compounding the error.

That approach is all wrong. None of these multi-factor tests or "intent" inquiries appear in any of the relevant FLSA or MCA provisions. Quite the opposite, in fact. The relevant text of the FLSA and MCA pronounce that the inquiry is based on the statutory scope of the

Secretary of Transportation's power (regardless of whether he has exercised it), which Congress itself has covered in detail by listing specific types of covered trips.

The 1948 DOL rule (last revised in 1971) has also caused needless confusion. Even if regulations could be relevant to the MCA Exemption inquiry, it would be ones issued by the Secretary of Transportation, not DOL, as the relevant aspects of the FLSA and MCA both refer to the power of the Secretary of Transportation, not of Labor. *See, e.g., Allen*, 755 F.3d at 294 n.13 (Dennis, J., dissenting) ("DOL does not have authority to define the scope of MCA jurisdiction."). Further, the 1948 DOL regulation largely parroted the then-current (and now-changed) statutory text, so it is now just another voice singing off-key.

As one circuit judge aptly put it: "Rather than probing the contours of interstate commerce within the meaning of the Motor Carrier Act, I would hold the plain language of the Act's jurisdictional statute to be dispositive. That statute gives the Secretary of Transportation the authority to establish qualifications and maximum hours for employees of a motor carrier—thereby triggering the Motor Carrier Act exemption— only 'to the extent that passengers, property, or both, are transported by

motor carrier ... between a place in ... a State and a place in another State,'" or across a U.S. national or territorial border. *Packard*, 418 F.3d at 259 (Nygaard, J., concurring in judgment).

Where the employees' transportation is entirely within one state, the "Secretary of Transportation has no power to establish [the employees'] qualifications and maximum hours. Absent this power, the Motor Carrier Act exemption does not apply and [defendant] must comply with the Fair Labor Standards Act's overtime pay rules." *Id.*[3]

\* \* \*

Congress wanted its 1978 revisions to provide clarity, which unfortunately has remained elusive given the Court's continued reliance on "confusing," "incoherent," out of date, and atextual frameworks for the MCA Exemption. Slip.Op.12–13 (Oldham, J., concurring in judgment).

"[W]hether Appellees' employment would fall within the [old] statutory definition [and caselaw] is irrelevant, as that definition no longer exists in the United States Code. What *does* exist is the present

_____

[3] This means, of course, that cases interpreting the now-deleted language of the MCA Exemption are not binding. *Packard*, 418 F.3d at 260 n.11 (Supreme Court caselaw on old statute "has no bearing upon the scope of the Motor Carrier Act exemption" after the 1978 revision).

day jurisdictional statute, the plain language of which resolves this appeal without the need for resort to regulatory definition or case law." *Packard*, 418 F.3d at 260 (Nygaard, J., concurring in judgment).

## C. THE PLAIN-TEXT ANSWER IS STRAIGHTFORWARD.

The Court should grant rehearing to revisit those confusing frameworks and adhere instead to the text of the FLSA and MCA, which provides a clear and administrable test, as explained above: Did the motor carrier employee transport passengers or property across a U.S. state, national, or territorial border, or in an Indian reservation that is either under the exclusive jurisdiction of the United States or on a public highway? *See* 49 U.S.C. 13501, 31502(a)(2).

In nearly every case, there will be a very obvious answer. Eliminating the unpredictable six- and eight-factor balancing tests will foster prompt and efficient resolution of overtime claims.

## III. THIS CASE IS WORTHY OF *EN BANC* REHEARING.

*En banc* rehearing is warranted. The Court has previously and recently granted *en banc* on the scope of FLSA overtime exemptions. *See, e.g., Hewitt*, 15 F.4th 289 (addressing exemption for salaried employees). The MCA Exemption's application to employees whose transportation is

entirely intrastate is equally worthy of such review, given that the issue arises relatively often and is a somewhat-unique feature of this Circuit, given the size of Texas.

Further, the Court's current frameworks are (in Judge Oldham's words) "confusing" and "incoherent," leading to substantial amounts of wasted time and unpredictability. By contrast, jurists have recognized that the actual text of the FLSA and MCA easily resolves this issue. *See, e.g., Packard*, 418 F.3d at 259 (Nygaard, J., concurring in judgment).

This case also presents an ideal factual scenario: Plaintiff did not cross any borders, the oil was owned by someone else when it later did, and even then it was transported by pipeline, not by another motor carrier. This presents a prototypical example of intrastate transportation outside the scope of the MCA Exemption.

## CONCLUSION

The Court should grant rehearing *en banc*.

August 12, 2024

Respectfully submitted,

Colby Qualls
Katherine Serrano
FORESTER HAYNIE, PLLC
400 North Saint Paul St.
Suite 700
Dallas, TX 75201
(214) 210-2100
cqualls@foresterhaynie.com
kserrano@foresterhaynie.com

Jennifer L. Mascott*
R. Trent McCotter
  *Counsel of Record*
SEPARATION OF POWERS CLINIC
COLUMBUS SCHOOL OF LAW
THE CATHOLIC UNIVERSITY OF
  AMERICA
3600 John McCormack Rd.
Washington, DC 20064
(202) 706-5488
mccotter@cua.edu

*Counsel for Plaintiff-Appellee*

*\*Admitted in Virginia and Maryland*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

/s/ R. Trent McCotter

R. Trent McCotter

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3882 words, excluding the parts of the petition exempted by Rule 32(f). This petition complies with the typeface and typestyle requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ R. Trent McCotter

R. Trent McCotter

# EX. A

# United States Court of Appeals for the Fifth Circuit

---

No. 23-20494

---

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2024

Lyle W. Cayce
Clerk

Elizabeth Escobedo,

*Plaintiff—Appellee,*

*versus*

Ace Gathering, Incorporated,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-538

---

Before Higginson, Willett, and Oldham, *Circuit Judges.*

Don R. Willett, *Circuit Judge*:

In this certified interlocutory appeal concerning unpaid overtime wages, we must decide whether tanker-truck drivers who transport crude oil solely within the State of Texas are transporting property in "interstate or foreign commerce" under the Motor Carrier Act of 1980. Because most of the crude oil being transported is ultimately bound for destinations outside the state, our precedent requires that we answer yes.

I

Ace Gathering, Inc. is in the business of "crude oil gathering," which Ace describes simply as "gathering crude oil from oil fields and transporting it to pipelines in order to fulfill contracts with Ace's customers." For transportation between the oil fields and pipelines, Ace employs so-called Crude Haulers. Crude Haulers are drivers of large, 18-wheeled tanker trucks who drive to producers' oil fields, load crude oil onto their trucks, and then transport that oil on public roads and highways to an "injection point" on a pipeline. Once injected, the oil travels through the pipeline to Ace's customers, who then receive their monthly contractual volume of oil at the pipeline terminal.

Everyone agrees that, as far as Ace's business is concerned, the entire process described above takes place solely within the State of Texas. There is, to be sure, evidence in the record that some of Ace's Crude Haulers occasionally drove across state lines and that these interstate routes were assigned on a volunteer basis. But all the Crude Haulers in this case attest that they never volunteered for such routes and that their driving duties never took them beyond state lines.

Everyone also agrees that once the crude oil reaches Ace's customers at the pipeline terminal, the oil is then taken either to out-of-state refineries (usually in Louisiana) or to export markets for shipment outside the United States. Granted, it is also clear from the record that not *all* the crude oil ultimately leaves the state. But some of Ace's executives submitted affidavits attesting that approximately 68% to 90% of the oil is later exported to foreign markets and that a "significant portion" of it is taken to out-of-state refineries.

Based on these undisputed facts, lead plaintiff Elizabeth Escobedo, along with a putative class of former Ace Crude Haulers, sued Ace for unpaid

overtime wages under the Fair Labor Standards Act (FLSA). The Crude Haulers collectively allege that they "regularly or occasionally worked in excess of forty hours a week" and that Ace misclassified them as exempt from FLSA overtime pay. After conducting discovery, Ace moved for summary judgment, arguing that the Motor Carrier Act (MCA) exempted the Crude Haulers from FLSA overtime pay. In response, the Crude Haulers disputed that one element of the MCA exemption—transportation in "interstate or foreign commerce"—had not been met and that they therefore qualify for FLSA overtime pay.

The district court initially denied Ace's motion, finding that Ace had no "vested interest" in the crude oil once it crossed state lines via pipeline and that Ace's volunteer-based interstate driving assignments created a genuine dispute of material fact with respect to whether the Crude Haulers had a reasonable expectation to drive across state lines. Upon a motion for reconsideration, however, the district court certified the following three questions for interlocutory appellate review under 28 U.S.C. § 1292(b):

1. Does the transportation of crude oil, in and of itself, have a substantial impact on interstate commerce for the purposes of the Motor Carrier Act?

2. Does the "vested interest" test apply to crude oil transportation? If so, whose interest may the court consider?

3. Does a volunteer-based driving system create a reasonable expectation of interstate travel?

A panel of this court granted leave to file this interlocutory appeal, and we now review the certified questions *de novo*.[1]

---

[1] *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 526 (5th Cir. 2022).

## II

At the outset, we note that our "jurisdiction is not confined to the precise question[s] certified by the lower court."[2] It is instead delimited only by the particular order being appealed.[3] Here, that is the district court's order denying Ace summary judgment on the ground that the Crude Haulers were not transporting property in "interstate or foreign commerce" under the MCA. With the benefit of the parties' thorough briefing and the district court's reasoning below, we find that we can resolve that broader issue without the need to specifically answer any of the three certified questions.

## III

The MCA and the FLSA, which date back to the 1930s,[4] both regulate (among other things) the hours employees can work.[5] Congress deliberately sought to avoid any overlap between the two statutes, however, and to that end exempted from the FLSA any employee who was already regulated by the Interstate Commerce Commission pursuant its regulatory power under the MCA.[6] The same exemption still applies today, but the relevant statutory provisions now reflect the transfer of power from the now-defunct ICC to the Department of Transportation.[7] Thus, the FLSA's

---

[2] *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018).

[3] *United States v. Stanley*, 483 U.S. 669, 677 (1987).

[4] Pub. L. No. 74-255, 49 Stat. 543 (1935) (Motor Carrier Act); Pub. L. No. 75-718, 52 Stat. 1060 (1938) (Fair Labor Standards Act).

[5] *See* 49 U.S.C. § 31502; 29 U.S.C. § 207.

[6] *See* Pub. L. No. 75-676, 52 Stat. 1060, 1068, § 13(b) (1938) (exempting "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carriers Act, 1935"); *see also Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966) ("There is no concurrent jurisdiction between the Fair Labor Standards Act and the Motor Carrier Act." (internal citation omitted)).

[7] *See* Pub. L. No. 89-670, 80 Stat. 931, 939–40, § 6(e)(6)(C) (1966) (codified at 49

overtime-pay provision does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the MCA.[8]

The two criteria for qualifying under the MCA exemption are set forth in 29 C.F.R. § 782.2(a): first, the employee must be "employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary of Transportation's] jurisdiction under section 204 of the Motor Carrier Act"; and second, the employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."

No one here disputes that the regulation's first requirement is met; nor does anyone dispute that the Crude Haulers were engaged in "safety-affecting activities" under the regulation's second requirement. The parties instead disagree, narrowly, on whether the Crude Haulers' transportation duties have triggered the second requirement's interstate- or foreign-commerce element.

The MCA defines interstate commerce as, simply, transportation "between a place in a State and a place in another State."[9] Our precedent construing this definition, however, has not been so simple. As we observed a little over a decade ago, the MCA's definition of interstate commerce "has

---

U.S.C. § 31502(b)) (transferring to the Secretary of Transportation "all functions, powers, and duties of the Interstate Commerce Commission" related to promulgating "qualifications and maximum hours of service of employees" subject to the Motor Carrier Act).

[8] 29 U.S.C. § 213(b)(1).

[9] 49 U.S.C. § 13501(a).

not been applied literally by the courts."[10] We have instead applied the MCA exemption not only to "the actual transport of goods across state lines," as its definition plainly suggests, but also to "the *intrastate* transport of goods in the flow of interstate commerce."[11]

This more capacious understanding of interstate commerce has, perhaps unsurprisingly, precipitated line-drawing problems and, alas, various multifactor balancing tests. At bottom, however, we have long recognized the "elemental" principle that "a carrier is engaged in interstate commerce when transporting goods . . . *ultimately bound* for destinations beyond Texas, even though the route of the particular carrier is wholly within one state."[12] Indeed, so long as "goods carried are in the course of through transit" to another state, we have observed, "[t]raffic need not physically cross state lines to be in interstate commerce."[13]

Cases from both our court and the Supreme Court illustrate how this principle works in practice. In *Shew v. Southland Corp.*, for example, we held that drivers for a dairy business, who delivered dairy products between Dallas and Midland, engaged in interstate commerce under the MCA because the products they were transporting originated outside the state.[14] "Though the transportation by Southland from Dallas to points in Texas is between points in the same state," we reasoned, "these shipments originate out of the state and are part of a continuous movement in interstate commerce."[15] Similarly,

---

[10] *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (citation omitted).

[11] *Id.* at 472 (emphasis added) (citing *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976)).

[12] *Merchants Fast Motor Lines*, 528 F.2d at 1044 (emphasis added).

[13] *Id.*

[14] 370 F.2d at 380.

[15] *Id.*

in *United States v. Capital Transit Co.*, the Supreme Court held that a D.C. bus company's transportation of passengers solely within D.C. qualified as interstate commerce because its passengers were ultimately bound for Virginia.[16] The bus company's "intra-District streetcar and bus transportation of passengers going to and from Virginia establishments," the Supreme Court held, "is an integral part of an interstate movement."[17]

The same line of reasoning from these cases can, in our view, be straightforwardly applied to this case. It is undisputed that the crude oil Ace ships to its customers is often bound for out-of-state locations. Ace's customers either trade the crude oil on the export market for transport to other countries or refine the crude oil in refineries in other states, like Louisiana. So while the Crude Haulers' transportation of the crude oil is indeed entirely intrastate, their transportation is but one segment of the crude oil's larger interstate journey[18] and, by all indications, part of the crude oil's "practical continuity of movement"[19] out of the state. Thus, under controlling precedent, we tread no new ground in holding that purely intrastate transportation rises to the level of interstate commerce when the product is ultimately bound for out-of-state destinations, just as the crude oil was here.

## IV

The Crude Haulers, for their part, not only failed to rebut Ace's summary-judgment evidence on this point, but also do not offer any

---

[16] 338 U.S. 286, 290 (1949).

[17] *Id.*

[18] *Cf. Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 219–20 (2d Cir. 2002) (purely intrastate transportation was interstate commerce because the "carriage was merely one leg of a route to an out-of-state destination").

[19] *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943).

meaningful response to Ace's argument that their transportation of crude oil constitutes "the intrastate transport of goods in the flow of interstate commerce."[20] Instead, according to the Crude Haulers, the only relevant question we need ask is whether Ace had a "fixed and persisting intent" to ship the crude oil across state lines.

The fixed-and-persisting-intent test derives, as far as we can tell, from *Baltimore & O.S.W.R. Co. v. Settle*, in which the Supreme Court rejected an interstate shipper's contention that its commerce was purely intrastate because its segmented shipments "came to rest" at multiple local destinations.[21] Crucially, in that context, the Court found it necessary to holistically evaluate the "intention with which the shipment was made" in order to determine whether the shipment was interstate in character."[22]

Since *Settle* and other similar cases,[23] we have consistently applied the fixed-and-persisting-intent test only to those cases in which the product being shipped was stored in a warehouse or other facility during its interstate journey.[24] Granted, when we occasionally recited the test, we did so broadly,

---

[20] *Siller v. L & F Distributors, Ltd.*, 109 F.3d 765, at *1 (5th Cir. 1997).

[21] 260 U.S. 166, 169 (1922).

[22] *Id.* at 170.

[23] *E.g.*, *Texas & N.O.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 122 (1913) (evaluating the "essential character" of the shipment for a company that had completed one intrastate leg of interstate transportation).

[24] *E.g.*, *Siller*, 109 F.3d at *2 (discussing the shipper's intent when the shipment "sat in a warehouse anywhere from 6 to 28 days"); *Central Freight Lines v. ICC*, 899 F.2d 413, 420 (5th Cir. 1990) (discussing the shipper's intent when the shipments came to rest at "Texas storage terminals"); *Texas v. United States*, 866 F.2d 1546, 1549, 1560–61 (5th Cir. 1989) (discussing the shipper's intent when the shipments "s[at] in the Arlington warehouse"); *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 5 F.3d 911, 917–18 (5th Cir. 1993) (discussing the shipper's intent when the shipment stopped at a warehouse); *Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir. 1937) (discussing the shipper's intent when "the shipment comes to rest within the state of origin and the goods are thereafter

not expressly indicating that it was reserved for a particular category of cases.[25] But a close reading of our precedent and the Supreme Court's reveals that ascertaining the shipper's intent is necessary only because a product can "come to rest" at a storage facility and thus end its interstate journey.[26] Confirming this understanding are cases from our sister circuits,[27] interpretative guidance offered by both the Department of Labor and the Interstate Commerce Commission,[28] and the demonstrable irrelevance of the

---

disposed of locally").

[25] *See, e.g.*, *Texas*, 866 F.2d at 1556 ("It is well settled that characterization of transportation between two points in a State as interstate or intrastate in nature depends on the essential character of the shipment. Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." (internal quotation and emphases removed)).

[26] *See, e.g.*, *Walling*, 317 U.S. at 568 ("The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey."); *see also supra*, notes 24 and 25.

[27] *E.g.*, *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154–56 (10th Cir. 2016) ("For certain types of shipments, the interstate nature of the transportation can become blurred as products are temporarily warehoused or moved by various carriers—some of whom may only complete intrastate portions of the journey."); *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410–12 (6th Cir. 1970) (determining whether a product has "come to rest" at a storage facility by asking whether the shipper had a "fixed and persisting intent" to move the products beyond the storage facility); *Kennedy v. Equity Transp. Co.*, 663 F. App'x 38, 40 (2d Cir. 2016) (explaining that a shipper's intent is relevant only to the extent products are warehoused along their interstate journey).

[28] *See* 29 C.F.R. § 782.7(b)(2) (discussing fixed and persisting intent for "transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State . . . ."); 8 I.C.C.2d 470, 471 ("If the merchandise comes to rest in a manner sufficient to break the continuity of the original interstate commerce, then subsequent transportation within the State by for-hire carriers may constitute transportation in intrastate commerce subject to applicable State regulation. The essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination.").

many factors we would ordinarily use for our inquiry into intent.[29]

There is no allegation in this case that Ace's oil was temporarily stored during any part of its interstate journey, at least while it was under Ace's control. The Crude Haulers, to be sure, suggest in a footnote that the crude oil was "stored" in the pipeline. But they do not cite anything in the record for that doubtful assertion, and we see no evidence otherwise indicating that the oil's "storage" in the pipeline interrupted its movement to customers. Indeed, if anything, the pipeline facilitated the crude oil's continuous movement from the injection point to the terminal. We therefore decline the Crude Haulers' invitation to determine whether Ace (which we will assume is a shipper, for the sake of argument) had a fixed and persisting intent to ship the crude oil out of the state.

V

In sum, we hold that the Crude Haulers transport property "in interstate or foreign commerce within the meaning of the Motor Carrier Act."[30] We accordingly REVERSE the district court's denial of summary judgment and REMAND with instructions to dismiss the plaintiffs' claims with prejudice.

---

[29] *See Siller*, 109 F.3d at *2 (looking to factors such as "whether a single shipper has control over both the inbound and outbound movements to and from the warehouse," "how many customers the storage facility serves," "how rapidly the product moves through the storage facility," "whether the shipment is made pursuant to a storage-in-transit provision in an appropriate tariff," and "whether the product goes through additional processing or manufacture at the storage facility").

[30] 29 C.F.R. § 782.2(a).

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

I have no reason to doubt the way my esteemed colleagues applied the Department of Labor's interpretive rule and our precedents. I write separately, however, to emphasize the confusion surrounding this area of law.

In 1971, the Department of Labor ("DOL") issued an interpretive rule exempting certain employees from federal overtime requirements. *See* 29 C.F.R. § 782.0; *cf.* 29 U.S.C. § 213(b)(1). That rule provides that exempt employees must, among other things, "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in *interstate or foreign commerce within the meaning of the Motor Carrier Act.*" *See* 29 C.F.R. § 782.2(a)(2) (emphasis added). The Motor Carrier Act of 1935 established federal regulatory authority over motor carriers engaged in such commerce. *See* Pub. L. No. 74-255, § 202(b), 49 Stat. 543, 543 (1935). In doing so, the Act narrowly defined both forms of commerce. *See id.* § 203(a)(10) ("'[I]nterstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State . . . ."); *id.* § 203(a)(11) ("'[F]oreign commerce' means commerce between any place in the United States and any place in a foreign country, or between places in the United States through any foreign country . . . ."). Based on those texts, you might reasonably think that the DOL interpretive rule exempted from overtime only those employees who *actually* crossed state or national borders in the course of their commercial activities—and *not* those whose intrastate activities might substantially affect interstate commerce under *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942).

Alas, it is not that simple. In 1978, and again in 1995, Congress changed the statutory provisions regarding motor carrier regulation. *See* Pub. L. No. 95-473, 92 Stat. 1337, 1361–62 (1978); Pub. L. No. 104-88, 109 Stat.

803, 859 (1995). As a result, federal authority no longer turned on whether motor carriers operated in "interstate or foreign commerce" as those terms are defined in the Motor Carrier Act. *See, e.g.*, 92 Stat. 1337, 1338, 1361–62 (asserting authority over motor carriers that cross state or national borders, or engage in transportation in reservations or on public roads); 49 U.S.C. §§ 13501, 13102(14) & (15) (West 2024) (same). Does DOL think it is still operating under the old, more-limited definition of interstate commerce embraced in the Motor Carrier Act? Or does DOL think the overtime exemption now reaches any employee whose intrastate activities substantially affect interstate commerce? Unclear. All we know is that DOL appears to have not changed its interpretive rule since 1971.

Adding confusion to incoherence, our precedents applying the 1971 rule say virtually nothing about its text. *See, e.g.*, *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (noting that the Motor Carrier Act's definition of interstate commerce "has not been applied literally by the courts" (citing *Siller v. L & F Distribs., Ltd.*, 109 F.3d 765, at *1 (5th Cir. 1997))). We have instead devised multiple, unmanageable standards for making overtime decisions. *See, e.g.*, *Merchs. Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976) (asking whether a good is "ultimately bound" for out-of-State destinations); *Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 917 (5th Cir. 1993) (asking whether "the fixed and persisting intent of the shipper" implicates interstate commerce). Moreover, we have developed an eight-factor balancing test to assess whether a class of employees has a "reasonable expectation" of interstate transportation. *See Olibas v. Barclay*, 838 F.3d 442, 449 n.11 (5th Cir. 2016) (asking "(1) whether all employees in the class have similar job duties, even if only some employees in the class make interstate trips; (2) whether the employer regularly sends some drivers to interstate destinations; (3) whether the employer requires its drivers to meet DOT requirements; (4) whether and with what frequency project

assignments are subject to change; (5) whether the drivers' assignments are given via dispatch based on customer need; (6) whether drivers have fixed or dedicated routes; (7) whether assignments are distributed indiscriminately; and (8) whether drivers risk termination for refusing trips from dispatch"). Of course, no factor is necessary, and none is dispositive. *See ibid.*

It is unclear how we are supposed to apply any of this given binding instructions—from both the Supreme Court and our en banc court—that text is king when it comes to overtime rules. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–90 (2018); *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 293–96 (5th Cir. 2021) (en banc), *affirmed*, 598 U.S. 39, 49–59 (2023). It is unclear how the 1971 rule comports with the text of the relevant statutes. And it is unclear how our precedents comport with the 1971 rule, which says nothing about factors like the good's ultimate destination or the shipper's state of mind.

Incoherent as they might be, the precedents bind us. So I concur in the judgment.